### In the DISCIPLINARY MATTER INVOLVING Ronald T. WEST, Respondent.

### No. S-3558.

Supreme Court of Alaska.

Jan. 25, 1991.

---

Walter R. Arden, Anchorage, for respondent.

Stephen J. Van Goor, Bar Counsel, Anchorage, for Alaska Bar Ass'n.

Before MATTHEWS, C.J., and RABINOWITZ, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal concerns issues of attorney misconduct stemming from Ronald T. West's actions with regard to a negotiated property loss settlement. A disciplinary action against West was heard by an Area Hearing Panel ("Panel"). The Panel concluded that West violated certain disciplinary rules and recommended a 90–day suspension from practice.

West and the Bar Association appealed to the Disciplinary Board of Governors of the Alaska Bar Association ("Board"). In its decision, the Board found that West's conduct constituted "serious criminal misconduct" and recommended a two-year suspension. The Board further recommended that West be required to petition for reinstatement, demonstrating his fitness to practice law and passage of the Multistate Professional Responsibility Exam (MPRE).

West now brings this appeal from the findings, conclusions, and recommendations of the Board.

## I. FACTS AND PROCEEDINGS.

### A. *The Release.*

Thomas Briggs, an independent truck owner and operator, was involved in an accident on the Dalton Highway. The accident was caused by a washed out approach to a bridge over the Nutilinktak River. Briggs was insured for the truck itself, but not for spare parts, personal effects, or loss of its use. Briggs retained West, on a one-third contingency fee basis plus costs, to represent him in a suit against the State of Alaska to recover damages for these uninsured items.

West filed a complaint against the state and subsequently entered into settlement negotiations with Northern Adjusters, which was acting on the state's behalf. The state made an offer to settle the suit but this offer was rejected by Briggs. A short time later, on March 7, 1986, Briggs died of a heart attack. His widow, Sandra Briggs, contacted West to inform him of her husband's death and inquire about the lawsuit's future. West discussed the claim with her and suggested that they accept the settlement offer, if it was still open. Mrs. Briggs agreed. West then contacted Northern Adjusters to discuss the settlement. An agreement was reached where, for $5,500 consideration, West would dismiss the case with prejudice and release the state from liability.

West then requested that Mrs. Briggs come to his office to sign the contemplated release. West, concerned that the settlement offer would be withdrawn if the state learned of Mr. Briggs' death, instructed Mrs. Briggs to sign the release form in both her name and her husband's name.[1]

---

1. West emphasizes throughout his briefing before us that he "considered Mrs. Briggs to be the *de facto* personal representative of" Mr. Briggs' estate at the time she signed the release. Mrs. Briggs was not officially named as one of the two co-personal representatives of the estate until April 10, 1988, two weeks after the release was signed. The other co-representative was Gary Briggs, a son of Mr. Briggs by an earlier marriage. West explained the delay in having

After Mrs. Briggs signed the release, West notarized it as follows:

> On the 26 day of March, 1986, before me personally appeared the above [referring to Thomas and Sandra Briggs] to me known to be the person(s) named herein and who executed the foregoing Release and they acknowledged to me that they voluntarily executed the same.

West then signed and dated the release in his capacity as a notary public.

West exchanged the release for the $5,500 settlement check, which was made out to "Thomas Briggs and Ron West, Attorney." West subsequently filed in the superior court a stipulation dismissing the case with prejudice. West deposited the check in a trust account, deducted one-third plus costs as his compensation, and wrote a check to the "Estate of Tom Briggs" for the remainder.[2]

### B. *Bar Association Proceedings.*

The Panel found that West violated the Code of Professional Responsibility: DR 1–102(A)(4), (5), (6), as well as DR 7–102(A)(5). In determining the appropriate

Mrs. Briggs named personal representative: he believed the length of such a proceeding might cause the state to learn of Mr. Briggs' death and thus withdraw the settlement offer.

2. West justified his actions by asserting that the claim was valid, the settlement amount fair, and the state would possibly and unjustly withdraw the offer if it knew of Brigg's death. West's actions were discovered by an attorney working on the Briggs estate. In a letter to the firm handling the estate, West explained his conduct as follows:

> I was faced with the choice of doing something according to the rules and seeing a client get screwed or not telling the defendant and getting something. I guess I wonder what one is to do when faced with the situation where if you do the right thing, your client might suffer or suffer a great deal and bending the rules to get something for the client.... It just really bothers me that if we had done nothing, the defendant would have prevailed, when they were so clearly at fault.

Prior to sending the letter to the firm handling the estate, West contacted the Alaska Bar Association and told them what happened. Thereafter, disciplinary proceedings were instituted against West.

3. The appropriate standard of review for attorney disciplinary proceedings is well established.

sanction, the Panel used the ABA Standards for Imposing Lawyer Sanctions (1986) as guidelines. The Panel recommended a 90–day suspension for West.

The Board affirmed the Panel's findings as to West's violations of the Code of Professional Responsibility. The Board disapproved of the Panel's recommended 90–day suspension; it concluded that a two-year suspension was more appropriate. The Board also required that West petition for reinstatement and pass the MPRE.

## II. DISCUSSION.

West specifies eleven separate errors.[3]

### A. *DR 1–102(A)(4).*

West contends that the Panel and Board erred in concluding that his misconduct involved fraud and that he, therefore, violated DR 1–102(A)(4).[4]

█ Violations of DR 1–102(A)(4) are restricted to intentional acts of misconduct. *In re Simpson*, 645 P.2d 1223, 1227 (Alaska 1982), *methodology modified by Disci-*

> Though this court has the authority, if not the obligation, to independently review the entire record in disciplinary proceedings, findings of fact made by the Board are nonetheless entitled to great weight. The deference owed to such findings derives from the responsibility to conduct disciplinary proceedings which this court has delegated to the Bar Association. Where findings of fact entered by the Board are challenged on appeal to this court, ... the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous.... As a general rule, moreover, we ordinarily will not disturb findings of fact made upon conflicting evidence....
>
> ....
>
> In deciding the appropriate punishment, we need not accept the Disciplinary Board's recommendation, but may exercise our own independent judgment....

*In re Simpson*, 645 P.2d 1223, 1226–28 (Alaska 1982) (citations omitted), *methodology modified by Disciplinary Matter Involving Buckalew*, 731 P.2d 48 (Alaska 1986).

4. Disciplinary Rule 1–102(A)(4) provides that:

> (A) A lawyer shall not:
>
> ....
>
> (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

*plinary Matter Involving Buckalew,* 731 P.2d 48 (Alaska 1986). The ABA Standards for Imposing Lawyer Sanctions provide that "intent" encompasses the "conscious objective or purpose to accomplish a particular result." ABA Model Standards, Lawyer Sanctions, Definitions, ABA/BNA at 01:807 (1986).

The Panel found West in violation of DR 1–102(A)(4). It concluded that West "intentionally notarized a signature that he knew to be false and, in the course of doing so, made statements and representations which he knew were false." The Panel further concluded that West's purpose was to cause the state "to enter into settlement at a time when [West] believed that if the facts were known the settlement might not be agreed to." The Board affirmed the Panel's conclusion with regard to DR 1–102(A)(4).

West asserts that he did not violate DR 1–102(A)(4) because his actions, while possibly negligent, were not intentional. West further contends that his actions in regard to the release were neither fraudulent nor material since the release was not relied upon by the state in making the settlement.

We reject West's contentions. It is clear that West violated DR 1–102(A)(4). The evidence shows that West intended the consequences of his actions. He intended that the state go through with the settlement even though Mr. Briggs was dead. Thus, we conclude that West engaged in dishonest conduct in violation of DR 1–102(A)(4).[5]

### B. *DR 1–102(A)(5).*

West further contends that the Panel and Board erred in holding that his actions constituted conduct prejudicial to the administration of justice in violation of DR 1–102(A)(5).[6] More particularly, West argues that his actions, although admittedly improper, were intended to "facilitate" justice. Additionally, West asserts that justice was not obstructed since the questioned release was never intended to be filed in court.

West's contentions are devoid of merit. The record clearly reveals that West violated DR 1–102(A)(5). West admits that he notarized a statement which he knew to be false. It is beyond dispute that such conduct is in fact prejudicial to the administration of justice.[7]

### C. *DR 1–102(A)(6).*

■ West first contends that DR 1–102(A)(6) applies to such "other conduct" as is not proscribed by DR 1–102(A)(3)–(5) and is only to be used when the other subsections of DR 1–102 are inapplicable.[8] Alternatively, West asserts that DR 1–102(A)(6) is constitutionally infirm because reasonable attorneys "must guess what conduct it proscribes."

In our view, West's first contention has merit. DR 1–102(A)(6) is intended as a "catch-all" for such "other conduct" as is not proscribed by the preceeding provisions of DR 1–102. The Board has presented no argument to support a position that West

---

5. This court has found DR 1–102(a)(4) violations where an attorney fabricated a deed and attached it to an amended complaint, *Disciplinary Matter Involving Walton,* 676 P.2d 1078, 1081–86 (Alaska 1983), *appeal dismissed mem. sub. nom. Walton v. Alaska Bar Assoc.,* 469 U.S. 801, 105 S.Ct. 54, 83 L.Ed.2d 6 (1984), and where an attorney falsified documentary evidence and falsely affirmed their authenticity. *Matter of Stump,* 621 P.2d 263 (Alaska 1980), *methodology modified by Buckalew,* 731 P.2d 48.

6. Disciplinary Rule 1–102(A)(5) provides that
   (A) A lawyer shall not:
   . . . .
     (5) Engage in conduct that is prejudicial to the administration of justice.

7. This court has found DR 1–102(A)(5) violations where an attorney fabricated a deed and attached it to an amended complaint, *Walton,* 676 P.2d at 1081–88; where an attorney submitted an inaccurate interrogatory response, *Simpson,* 645 P.2d at 1228; and, where an attorney signed an affidavit, which was filed with the court, stating that a note was prepared and sent on a certain date when the note was actually prepared five years later, *Stump,* 621 P.2d at 267.

8. DR 1–102(A)(6) provides:
   (A) A lawyer shall not:
   . . . .
     (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

can be found to have violated both DR 1–102(A)(4) & (5), and also DR 1–102(A)(6).

We reject West's alternative contention that DR 1–102(A)(6) is void for vagueness. Regarding vagueness, we have said that

The Code of Professional Responsibility is necessarily written in broad terms. It would be extremely difficult, if not impossible, to develop standards specifically detailing all forms of attorney misconduct. Although capable of broad interpretation, we believe the meaning of the Disciplinary Rules cited in this case is sufficiently clear to satisfy the requirements of due process.

*In re Vollintine*, 673 P.2d 755, 758 (Alaska 1983). *See also Committee on Professional Ethics v. Durham*, 279 N.W.2d 280, 284 (Iowa 1979) (DR 1–102(A)(6) not violative of a "reasonable attorney" due process standard as applied to alleged intimate physical contact by attorney with inmate client during prison visits). West's conduct involved dishonesty which clearly reflected upon his fitness to practice law. Therefore, we conclude that DR 1–102(A)(6), as applied to West, does not violate due process.[9]

D. *Appropriate Sanctions.*

■ In *Buckalew*, we stated that "we will refer to the ABA Standards [for Imposing Lawyer Sanctions] and methodology as an appropriate model for determining sanctions for lawyer misconduct in this state," 731 P.2d at 52. The ABA Standards provide a four-pronged test for determining disciplinary sanctions:

(1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)

(2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?)

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?)

(4) Are there any aggravating or mitigating circumstances?

ABA Standards, Theoretical Framework, ABA/BNA at 01:805–06.

*Id.* These questions are addressed within a three-step methodology:

Under the foregoing methodology, our task in this case is threefold. The initial step requires that we answer the first three "prongs" of the ABA test set forth above. Next, we must look to the ABA Standards to discern what sanction is recommended for the "type" of misconduct found in our initial inquiry. After determining the recommended sanction, we must ascertain whether any aggravating or mitigating circumstances exist which warrant increasing or decreasing the otherwise appropriate sanction. *See,* ABA Standards, Methodolgy [sic], ABA/BNA at 01:803–04.

*Id.*

(i). Ethical Duties.

As previously discussed, West violated DR 1–102(A)(4) (fraudulent conduct); DR 1–102(A)(5) (conduct prejudicial to the administration of justice); and DR 7–102(A) (knowingly making a false statement of law or fact while representing a client). Each of these violations constituted breaches by West of ethical duties. *See* ABA Model Standards, Lawyer Sanctions § 4.6 (Duties Owed to Clients; Lack of Candor); § 5.1 (Duties Owed to Public, Failure to Maintain Personal Integrity); § 6.1 (Duties Owed to the Legal System; False Statements, Fraud and Misrepresentation); § 6.2 (Duties Owed to the Legal System; Abuse of Legal Process). *See also* ABA Model Code of Professional Responsibility EC 1–5 (1980) ("Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To law-

---

9. We note that the Panel, with the Board affirming, also found West in violation of DR 7–102(A)(5) ("In his representation of a client, a lawyer shall not ... knowingly make a false statement of law or fact."). Review of the record shows that West admits he violated DR 7–102(A)(5), but contends the "violation was *de minimis*" in view of his overall "legitimate goal of receiving the proceeds of the prior settlement of the estate while retaining the client's confidences." In our view, such action is not *de minimis.*

yers especially, respect for the law should be more than a platitude.").

#### (ii). Mental State.

The second prong of the test requires determining West's mental state.[10] The Panel, with the Board affirming, concluded that West's misconduct was both knowing and intentional. The Panel based it conclusion on the fact that West intended the state to believe that Mr. Briggs actually signed the release. We affirm. The requisite intent does not have to include malfeasance, only "the conscious objective or purpose to accomplish a particular result." ABA Model Standards, Definitions, ABA/BNA at 01:807.[11]

#### (iii). Injury or Potential Injury.[12]

The Panel, with the Board affirming, found actual injury to both the public and the legal profession as a result of West's misconduct. At a minimum, it impairs confidence in attorneys' honesty. Additionally, the Panel, with the Board affirming, found the potential for injury "to the estate, Mrs. Briggs, and the state as settling party, as a result of [West's] actions in permitting [the] false release to be signed and used in settlement of the Briggs' lawsuit."

West asserts that his misconduct caused no actual injury to anyone. West points out that the estate was satisfied with the settlement, and the state considered the settlement amount fair, stating that its position would not have changed had it known of Mr. Briggs' death. West maintains that to find actual injury here provides no guidance in those situations where actual harm really exists. For essentially the same reasons, West also asserts that there was no potential injury. West suggests that no potential injury exists if later facts show the potential injury to be "highly theoretical."

Bar counsel supports the Panel's finding that the public and the legal system suffer whenever a notary public engages in misconduct. Additionally, Bar counsel asserts that West's conduct "created potential injury and expense to the legal system had the settlement been withdrawn because of the false release and further proceedings ensued over the enforceability of that false release."

Regarding this point, the Panel concluded

---

**10.** As we explained in *Buckalew,* 731 P.2d at 53 nn. 18 & 19:

> The ABA Standards define "Intent" as: "the conscious objective or purpose to accomplish a particular result." ABA Standards, Definitions, ABA/BNA at 01:807. *Accord* AS 11.81.-900(a)(1) (defining criminal intent as a conscious objective to cause a particular result).
> The ABA Standards define "knowledge" as: "The conscious awareness of the nature or attendant circumstances of the conduct ... without a conscious objective ... to accomplish a particular result." ABA Standards, Definitions, ABA/BNA at 01:807. *Accord* AS 11.81.900(a)(2) (knowingly for criminal acts defined as an awareness that conduct is of a particular nature or that a particular circumstance exists).
> The ABA Standards define "Negligence" as: "The failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Model Standards, Definitions, ABA/BNA at 01:807. *Accord* AS 11.81.900(a)(4) (defining criminal negligence as "fail[ing] to perceive a substantial and unjust-

ifiable risk that the result will occur or that the circumstance exists.")

**11.** We have found an attorney's actions to be knowing and intentional "[w]hen he prepared [a] forged 'settlement agreement' ... with the conscious objective to deceive Whittier Fuel into believing its case had been settled." *Buckalew,* 731 P.2d at 53.

**12.** The ABA Model Standards provide definitions for "injury" and "potential injury":

> "Injury" is harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from "serious" injury to "little or no" injury; a reference to "injury" alone indicates any level of injury greater than "little or no" injury.
>
> . . . .
>
> "Potential injury" is the harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct. ABA Model Standards, Definitions, ABA/BNA at 01:807.

... actual injury to both the public and the legal profession occurs whenever an attorney falsifies documents, intentionally misuses his notary seal, or similarly deceives the public or an opposing party. Such actions fall well below the standard of conduct expected of attorneys and, if nothing else, destroys both the public's and the legal system's confidence in the honesty of the attorneys with whom they have dealings.

We cannot fault these observations, although we agree with West that little or no actual injury to the estate or the State of Alaska occurred. As West points out, no one has challenged the settlement or suggested that they would have acted in any other manner.

Concerning West's contentions that there was no potential injury as a consequence of his conduct we take a different view. It was "reasonably foreseeable" that, at the time West notarized the release, harm could come to the Briggs' estate, the public, the legal system and the legal profession. As Bar counsel points out, had the settlement been withdrawn because of West's misconduct, the ensuing legal entanglements would have injured the following: the estate, at the least, in not receiving the settlement money; the state, in spending time and resources to assert its position and defend its actions; the legal system, in expending time and resources to settle any dispute arising from the false release; and the public, in ultimately paying for the implications of West's misconduct.

(iv). Recommended Sanctions in Light of West's Misconduct.

The Board's decision found

... that Mr. West's conduct constituted serious criminal misconduct involving intentional interference with the administration of justice, false swearing and misrepresentation, and this is more appropriately described under paragraphs 5.11 and 5.12 [sanction standards]. The Board disapproves of the committee's recommended sanction of 90 days suspension as not severe enough for these serious violations. The lack of proof of a selfish motive, the remoteness of prior offenses and the presence of personal and medical problems serve to mitigate the otherwise appropriate sanctions of disbarment, or more lengthy suspension.

The Board, therefore, concludes that the most appropriate sanction is a 2 year suspension for Mr. West, coupled with a requirement that Mr. West as a condition of readmission to the bar be required to petition for reinstatement and demonstrate his fitness to practice, and to take and pass the Multistate Professional Responsibility Examination.[13]

Sections 5.11 and 5.12 of the ABA Model Standards for Imposing Lawyer Sanctions provide that either disbarment or suspension are appropriate sanctions in the factual context of this case.[14] We affirm the Board's determination that disbarment or suspension are generally appropriate sanctions given the nature of West's miscon-

**13.** The Board specifically disapproved of the Panel's finding that ABA Sanctions guideline 5.13 was applicable. Standard 5.13 reads as follows:
Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

**14.** Section 5.11 provides the following:
Disbarment is generally appropriate when:
(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or

theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.
Section 5.12 states:
Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

duct,[15] and specifically reject West's assertion that Section 5.13 (Reprimand) is applicable in this factual context.

### (v). Aggravating or Mitigating Factors.

In addressing the subject of aggravating factors,[16] the Panel gave "little weight" to the previous disciplinary actions which involved West, finding that the prior conduct was dissimilar from that involved in the present case. Additionally, the Panel found no selfish or dishonest motive in West's actions. The Panel did, however, find that West's length of practice was an aggravating factor in that he must have known of his conduct's impropriety.

Prior disciplinary offenses are relevant in an aggravating factors analysis. ABA Model Standards, Lawyer Sanctions, § 9.21(a), ABA/BNA at 01:841. West violated the Code of Professional Responsibility on three occasions prior to the present action. On each occasion, West received a private admonition as a sanction. Thus, we find no merit in West's contention that neither the Panel nor the Board should have considered these prior disciplinary offenses.

A dishonest or selfish motive is also relevant in an aggravating factors analysis. ABA Model Standards, Lawyer Sanctions, § 9.21(b), ABA/BNA at 01:841. West had a one-third contingency fee plus costs arrangement with Briggs. West's share of the settlement proceeds was $1,650. It is conceivable that the collection of this money provided a motive for West to act as he did.

Finally, an attorney's experience in the practice of law is relevant in an aggravating factors analysis. ABA Model Standards, Lawyer Sanctions, § 9.21(i), ABA/BNA at 01:842. West has been a member of the Alaska Bar Association since 1971. In our view, West's extensive practice experience provides the only significant aggravating circumstance in this case.[17]

In regard to mitigating factors, the Panel, in its findings and conclusions regarding sanctions, found the following: [18]

> (g) refusal to acknowledge wrongful nature of conduct;
> (h) vulnerability of victim;
> (i) substantial experience in the practice of law;
> (j) indifference to making restitution.
> *Id.* § 9.22, at 01:841–42.

---

**15.** The Panel concluded that Section 6.12 applied to West's misconduct. This standard reads:

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

We reject West's contention that his actions should not be construed as involving a false statement made to the court. In submitting the release, West knew that his misstatement of fact would be implicated in a legal proceeding.

**16.** Aggravating factors "may justify an increase in the degree of discipline to be imposed." ABA Model Standards, Lawyer Sanctions, § 9.21, ABA/BNA at 01:841. These factors include the following:

> (a) prior disciplinary offenses;
> (b) dishonest or selfish motive;
> (c) a pattern of misconduct;
> (d) multiple offenses;
> (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
> (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

**17.** We agree with the Panel and the Board that two of the prior disciplinary actions are remote in time, and that all are dissimilar to the misconduct at issue. Additionally, the amount of money West stood to gain is not, in our view, sufficient to have induced West to risk getting caught.

**18.** Mitigating factors "may justify a reduction in the degree of discipline to be imposed." ABA Model Standards, Lawyer Sanctions, § 9.31, ABA/BNA at 01:842. These factors include the following:

> (a) absence of a prior disciplinary record;
> (b) absence of a dishonest or selfish motive;
> (c) personal or emotional problems;
> (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
> (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
> (f) inexperience in the practice of law;
> (g) character or reputation;
> (h) physical or mental disability or impairment;

Respondent argues in mitigation that he was suffering from severe personal and emotional problems and that he was suffering from mental disability or impairment at the time of misconduct. The testimony at the sanctions hearing established that, at the time of Respondent's misconduct, he was involved in contested and very expensive litigation relating to personal business matters and that this litigation threatened to ruin him financially. As a result of the pressures in his personal life, Respondent was suffering from intermittent depression which, ultimately, caused him to seek psychiatric assistance. Respondent is presently under the care and counseling of a psychiatrist. Respondent also called several attorneys as witnesses to his good character and reputation. This testimony was not substantially refuted by the Bar and is accepted as a mitigating factor by the panel.[19]

In our view, the Panel's findings concerning mitigating circumstances are fully supported by the record.

## III. CONCLUSION.

Our study of the record and the arguments of the parties to this appeal persuades us that the Panel's recommended sanction should be adopted as the appropriate sanction in this case. In its conclusions regarding sanctions, which we expressly adopt, the Panel stated,

Bar counsel has recommended that Respondent be suspended for a period of time not to exceed two years as a result of his conduct. Conversely, Respondent argues that he should be issued a private reprimand. The panel has concluded that a private reprimand is not sufficient to express the seriousness of Respondent's conduct. The bar and the public have a right to expect that lawyers will

(i) delay in disciplinary proceedings;
(j) interim rehabilitation;
(k) imposition of other penalties or sanctions;
(l) remorse;
(m) remoteness of prior offenses.
ABA Model Standards, Lawyer Sanctions, § 9.32, ABA/BNA at 01:842.

not counsel their clients to affix false signatures to legal documents, misuse their notary power to verify what the attorney knows is a false signature or use documents falsely signed and notarized in settlement of legal disputes:

[W]e cannot ignore the fact that our paramount duty, "lies in the assurance that the public will be protected in the performance of the high duties of ... attorney[s].... Our primary concern must be the fulfillment of proper professional standards, whatever the unfortunate cause, emotional or otherwise for the attorney's failure to do so."

*Disciplinary Matter Involving Buckalew,* 731 P.2d 48, 54 (Alaska 1986) (quoting *In re Possino* [37 Cal.3d 163, 207 Cal.Rptr. 543, 548], 689 P.2d 115, 120 (Cal.1984)). Respondent's conduct in this case was less serious than that involved in *Buckalew.* Respondent was not trying to cover-up the consequences of his own malpractice. Indeed, the irony of this situation is that if Respondent had followed proper procedures and opened an estate so that the proper legal representative could affix his or her signature, the same settlement could probably have been effected just a few weeks later. Nor is Respondent's conduct as serious as that in *Disciplinary Matter Involving Walton,* 676 P.2d 1078 (Alaska 1983), in which the false document was created by the attorney and then used affirmatively in court proceedings. On the other hand, Respondent's conduct is more serious than that in *Matter of Conti* [75 N.J. 114], 380 A.2d 691 (New Jersey 1977) in which an attorney directed his secretary to sign the clients' names to deeds after contacting the clients, who had moved away, and being instructed to do whatever was necessary to have the deeds recorded. The discipline in *Buckalew* was

**19.** In its decision, the Board found that the "lack of proof of a selfish motive, the remoteness of prior offenses and presence of personal and medical problems serve *to mitigate the otherwise* appropriate sanctions of disbarment, or more lengthy suspension."

disbarment. The discipline in *Walton* was suspension for 18 months. The discipline in *Conti* was a reprimand. The seriousness of Respondent's conduct suggests that a suspension for a period of 90 days is appropriate. The panel recommends a 90 day suspension.[20]

Ronald T. West is suspended from the practice of law for a period of 90 days.

COMPTON, Justice, dissenting.

The court rejects, as it is free to do, the Board's recommendation that West be suspended for two years and instead "adopts" the Panel's recommendation that he be suspended for 90 days. However, by juxtaposing the Board's recommendation with the Panel's, the court creates the impression that it is in an "either/or" situation, despite its acknowledgement that "we—may exercise our own independent judgment ..." in determining an appropriate sanction. The responsibility for determining an appropriate sanction rests with this court. While we may benefit from understanding why the Panel or the Board made a particular recommendation, we must articulate why *we* have chosen the specific sanction we impose. I do not believe it sufficient to say that as between the two recommendations on the table, we prefer this one to that.

The court "concludes" that West engaged in dishonest conduct, in violation of DR 1–102(A)(4); conduct prejudicial to the administration of justice, in violation of DR 1–102(A)(5); and, while in his representation of his client, "knowingly mak[ing] a false statement of law or fact," in violation of DR 7–102(A)(5). The court directs our attention to ABA Model Standards, Lawyer Sanctions, § 4.6 (Duties Owed to Clients; Lack of Candor); § 5.1 (Duties Owed to Public; Failure to Maintain Personal Integrity); § 6.1 (Duties Owed to the Legal System; False Statements, Fraud and Misrepresentation); and § 6.2 (Duties Owed to the Legal System; Abuse of Legal Process). It then expressly adopts the Panel's conclusions regarding the appropriate sanction, a 90–day suspension.

In adopting the Panel's conclusions, the court must be saying that it has concluded, independently of the Panel's recommendations, that a 90–day suspension is an appropriate sanction. Except by reference to the Panel's conclusions, the court does not say why 90 days is appropriate. The Panel's own conclusions are based in large part on a comparison of three disciplinary cases, two of which predated our adoption of ABA Standards as guidelines in disciplinary proceedings, and one of those two is not even an Alaska decision. I cannot agree that knowing, intentional misconduct of the kind engaged in by West is deserving of only a 90–day suspension.

In my view, West's misconduct falls squarely within § 5.11(a) of ABA Standards for Imposing Lawyer Sanctions, which provides:

---

**20.** West has additionally argued that Bar counsel's disclosure to the Panel of other grievances concerning West was a breach of confidence in violation of Alaska Bar Rule 22(b) and constituted prejudicial error. West, prior to the Panel's decision in the Briggs matter, alleged that Bar counsel had breached a confidentiality. Bar counsel brought this matter to the attention of the Panel in a closed proceeding at which West's counsel, John Strachan, was present. The Panel inquired as to the basis for the allegations. Bar counsel stated that he had discussed with another of West's attorneys, Richard Crabtree, "other grievances" in which West was involved. It is the reference to "other grievances" that West argues constitutes prejudicial error.

Regardless of the merits of the initial breach of confidentiality claim, no prejudicial error is found in Bar counsel's conduct. First, a reference to "other grievances" is not enough, in our opinion, to prejudice the Panel. Second, the precedential effect of West's position would be to make Bar counsel unable to respond to allegations of improper conduct involving himself or herself which were initiated by another party.

West also argues that, due to the Panel's confusion and uncertainty in dealing with procedural motions, good cause exists for his failure to file a peremptory challenge motion within the specified time period and, as a result of the error in denying his challenge, he suffered prejudice. There is no evidence of this "confusion" and "uncertainty." Indeed, the Panel found that the Bar Association had repeatedly attempted to inform West of the Panel's membership, yet West did not accept his mail. The Panel's decision was not, in our opinion, erroneous.

We have reviewed West's remaining assertions of error and conclude they are without merit.

Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses.

ABA Standard for Imposing Lawyer Sanction § 5.11(a) (1986), *reprinted in ABA/BNA Lawyer's Manual on Professional Conduct* 01:829 (1986).

Mrs. Briggs committed perjury by signing her deceased husband's name to the release.[1] West was an accomplice to this crime.[2] The fact that Mrs. Briggs was not prosecuted or convicted of perjury is not a defense for West. AS 11.16.120(a)(2)(A).

There is no distinction between accessories and principals to a crime. *Rice v. State*, 589 P.2d 419, 420 (Alaska 1979).[3] Perjury is a Class B felony AS 11.56.200(c). First offense Class B felons in most instances face no presumptive sentence, yet they may be sentenced, in an exceptional case, to up to ten years. AS 12.55.125(d). Normally, however, "a first offender should receive a more favorable sentence than the presumptive sentence for a second offender." *Austin v. State*, 627 P.2d 657, 658 (Alaska App.1981). Second offenders face a presumptive sentence of four years. AS 12.55.125(d)(1). Thus, if prosecuted, West conceivably could have received a four-year sentence. His misconduct cannot be considered petty. I view conduct considered by the laws of Alaska to be a Class B felony serious criminal conduct as contemplated by § 5.11(a) of the ABA Standards.[4]

---

**1.** "A person commits the crime of perjury if the person makes a false sworn statement which the person does not believe to be true." AS 11.56.-200(a). Mrs. Briggs, knowing that her husband was deceased yet not intending the state to believe he was alive, signed his name to the subsequently notarized release. As a result, Mrs. Briggs apparently committed the crime of perjury. Although the state has said it would have paid the claim even if it knew Mr. Briggs was dead, the fact that Mrs. Briggs' actions had no material effect on the settlement is no defense.

**2.** "A person is legally accountable for the conduct of another constituting an offense if ... with intent to promote or facilitate the commission of the offense, the person ... aids or abets the other in planning or committing the offense...." AS 11.16.110(2)(B). "'Aid and abet' means to help, assist, or facilitate the commission of a crime, promote the accomplishment thereof, help in advancing or bringing it about, or encourage, counsel, or incite as to its commission." *Thomas v. State*, 391 P.2d 18, 25 (Alaska 1964). *See also Hensel v. State*, 604 P.2d 222, 233 (Alaska 1979); *Carman v. State*, 602 P.2d 1255, 1261 (Alaska 1979).

West, concerned that the state would withdraw the settlement offer if the state were to find out about the death of Mr. Briggs, instructed Mrs. Briggs to sign the release form in both her name and her husband's name. Immediately after Mrs. Briggs signed the release, West notarized it as follows:

On the 26 day of March, 1986, before me personally appeared *the above* [written in, referring to Thomas and Sandra Briggs] to me

known to be the person(s) named herein and who executed the foregoing Release and *they* [written in] acknowledged to me that *they* [written in] voluntarily executed the same. West then signed and dated the release in his capacity as Notary Public. In counselling Mrs. Briggs to sign Mr. Briggs' name to the release, and then notarizing the release, West became an accomplice to the crime of perjury.

Materiality, while an element of the common law crime of perjury, is not an element of perjury as defined in the Alaska perjury statute. *Nelson v. State*, 546 P.2d 592, 594 (Alaska 1976); *Beckley v. State*, 443 P.2d 51, 54 (Alaska 1968). As a result, it is no defense for West that the state considered the settlement amount fair and testified after the deception representing that it would not have changed its position had it known of Mr. Briggs' death.

**3.** *Rice* cites former AS 12.15.010 for the rule of law abrogating all distinctions between accessories and principals. 589 P.2d at 420 n. 4. AS 12.15.010 was repealed during a revision of Alaska criminal laws which had as a goal placing Alaska's criminal laws within the appropriate titles of the Alaska Statutes. Ch. 166, §§ 1 & 21, SLA 1978. The fact that AS 12.15.010 was repealed during this revision of the criminal laws does not affect the rule of law established in *Rice*.

**4.** *Cf.* Alaska Bar R. 26(b) (defining "serious crime" for purposes of interim suspension as, alternatively, any which "would be a felony" under Alaska law, or involves false swearing as an element).

Even were § 5.11(a) inapplicable, at a minimum West's misconduct falls within the ambit of § 5.11(b), which provides:

Disbarment is generally appropriate when:

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

*ABA/BNA* at 01:829.

West intended the state to rely on the release in concluding the settlement. The fact that West knew Mr. Briggs was dead, yet proceeded with the settlement in a purposefully deceitful manner, shows dishonesty. Additionally, in my view, the fact that West was acting in his role as an attorney when the misconduct occurred "seriously adversely" reflects on his fitness to practice law. Consequently, disbarment is the starting point as a sanction for a violation of DR 1–102(A)(4) and (5), breaching a duty owed to the public, even leaving aside West's violation of DR 7–102(A)(5).

In regard to aggravating and mitigating factors, the motive for West's misconduct must be viewed as mixed. On the one hand, he was motivated by a desire to further his client's interests. On the other, he promptly deducted his contingent fee and costs from the proceeds, thereby evidencing a motive based on self interest.

There are several aggravating factors: West has one prior disciplinary offense not too remote to be considered in determining a sanction in this proceeding; he committed multiple offenses in this instance; he has substantial experience in the practice of law; and he has refused to acknowledge the wrongful nature of his conduct. According to West, he acted as he did in an effort to avoid the injustice he thought might result if he acted ethically. He believes that he was the victim of a hopeless dilemma, not a wrongdoer.

There are also mitigating factors: West was experiencing financial and emotional problems at the time these events occured; to his credit he has sought psychiatric counselling; and several attorneys and members of the community vouched for West's good character and reputation. He claims also that he was suffering from mental disability or impairment at the time, which I view as simply an aspect of West's emotional problems. I do not view this as a separate mitigating factor in this case.

Balancing the aggravating and mitigating factors, and giving some consideration to the fact that public censure is a cross that will be borne by West into the future, I conclude that a substantial suspension instead of disbarment is appropriate. I view West's conduct as at least as deserving of suspension as the suspension meted out in *Disciplinary Matter Involving Walton*, 676 P.2d 1078 (Alaska 1983), and thus would suspend West for at least eighteen months.