### In the DISCIPLINARY MATTER INVOLVING Stephen F. FROST, Respondent.

#### Nos. S–5169, S–5268.

Supreme Court of Alaska.

Nov. 26, 1993.

Keith A. Sanders, Asst. Bar Counsel, Anchorage, for Alaska Bar Ass'n.

Stephen F. Frost, pro. per.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

In this disciplinary case the hearing committee found that Stephen Frost violated four provisions of the disciplinary rules and recommended that he be suspended from the practice of law for eighteen months. Frost appealed to the disciplinary board, which accepted the committee's findings, but recommended that Frost should be suspended for a total of eight months.[1] Both the bar association and Frost now challenge the disciplinary board's recommendation. The bar contends that the board erred in rejecting the hearing committee's recommendation of an eighteen-month suspension. Frost contends that the evidence does not establish that he committed any violations and raises a number of procedural and jurisdictional points. We find that Frost committed only one minor violation and that censure is the appropriate discipline.

## I. BURDEN OF PROOF/STANDARD OF REVIEW

Bar counsel has the burden of proving the charges of misconduct in a petition for formal hearing by clear and convincing evidence. Alaska Bar Rule 22(e). This court reviews the evidence adduced before the hearing committee independently while giving deference to the findings of the board. Bar Rule 22(n); *In re Simpson*, 645 P.2d 1223, 1226–27 (Alaska 1982). On questions of sanctions, this court also exercises its independent judgment, guided by the American Bar Association Standards for Imposing Lawyer Sanctions (1986) and the sanctions imposed in

---

1. The board also recommended that Frost be required to pass the Multistate Professional Responsibility Exam (MPRE) prior to reinstate-ment and awarded the bar $8,500 in costs and attorney's fees.

comparable disciplinary proceedings. Alaska Bar Rule 22(r); *In re Schuler*, 818 P.2d 138, 139 (Alaska 1991).

## II. *STATEMENT OF FACTS*

This case arose when George Barth Sr. and Peter Barth filed grievances against Frost. Following an investigation, the bar association filed a ten-count petition for formal hearing. A nine-day evidentiary hearing was held August 19 through 29, 1991. We have reviewed the transcript of the hearing. Except where a dispute in testimony is noted, the following facts are supported by clear and convincing evidence.

George Barth Sr. (George Sr.), a businessman and former real estate salesman, was represented by Frost in a number of legal matters between 1982 and 1988. Frost was not George Sr.'s only attorney, however, as George Sr. was a frequent litigant who used numerous attorneys.[2]

In 1986 one of George Sr.'s brothers, Peter Barth, was involved in litigation against two of his other brothers, Tom Barth and John Barth, and another party, Virginia Gaylen, concerning a daycare center referred to as Hanson Acres. Peter asked George Sr. for his help in this litigation. George Sr. asked Frost to represent Peter but Frost declined, concluding that Peter was too emotionally distraught to deal with the case rationally. To overcome this problem, George Sr. took an assignment of Peter's interest in Hanson Acres and in the litigation in the name of George Sr.'s wholly-owned corporation, Alta Corporation (Alta). Under this assignment, Peter was to receive "the first Fifty Thousand Dollars ($50,000) cash received, without interest, after all costs and attorney's fees are paid." Alta then entered into a contingent fee agreement with Frost under which Frost would represent Alta in the litigation in exchange for fifty percent of any proceeds.

About six months after Frost entered the litigation a settlement was reached. Gaylen became the sole owner of the property and signed promissory notes, one in the amount of $50,000 in favor of Alta, and two in the amount of $40,000 in favor of Tom and John. These notes were secured by a second deed of trust on Hanson Acres. Hanson Acres was also subject to a prior deed of trust and note in the original amount of $305,000 administered by Sea-First Bank. This note was in default, and under the settlement Gaylen was required to pay it.

George Sr., through Alta, assigned fifty percent of the $50,000 note to Frost on September 2, 1986. In March of 1987 George Sr., on behalf of Alta, assigned Alta's remaining interest in the $50,000 note to George Sr.'s daughter, Diane Barth Olsbo. Frost prepared this assignment. George Sr. explained to Frost that he wanted this done because he was going to be out of the country and that Diane would be available for signing any and all necessary documents. It was understood that, although the assignment was absolute in form, the note was intended to be held for the benefit of Alta and, thus, for Peter.

In April of 1987 Frost agreed to conduct a non-judicial foreclosure proceeding on the Hanson Acres property. Frost wrote to George Sr. on April 17, 1987, stating, "I will bring the foreclosure action on behalf of Alta and Frost & Grashin and will evenly split the legal costs and legal fees with you." Consistent with this, on May 27, 1987, Frost wrote to the other holders of second deed of trust notes on Hanson Acres—Tom, John, and Diane—and obtained their consent to non-judicially foreclose the second deed of trust. Thereafter, Frost sent monthly statements to George Sr. captioned "Foreclosure v. Gaylen."

In June of 1987, under George Sr.'s direction, Diane assigned her interest in the $50,000 note to George Barth Jr. (George Jr.), George Sr.'s son. According to Diane,

---

**2.** The record indicates that George Sr. has been a party to more than fifty lawsuits since 1977; at least six of these cases involved disputes with attorneys, not including George Sr.'s pending civil action against Frost. George Sr. testified that over the past ten to fifteen years he has used from ten to fifteen attorneys.

the reason for this assignment was that she was about to file for divorce and she thought the note might become enmeshed in that litigation. Diane and George Sr. testified that they intended that the note would be held for the benefit of Alta and Peter. However, the assignment, like the assignment from Alta to Diane, was absolute on its face. After George Jr. received the assignment from Diane, he consented to being represented by Frost in the non-judicial foreclosure.

On August 14, 1987, Frost transmitted to Land Title Company, the trustee under the second deed of trust, the documents necessary to initiate the non-judicial foreclosure. On August 24, 1987, the trustee initiated the foreclosure by executing and recording a notice of default and sale. The sale was scheduled for December 10, 1987. The deed of trust sale took place as scheduled and the successful purchasers were the record owners of the second deed of trust notes: John, Tom, George Jr., and Frost's law firm. The purchase was made with an offset bid. The trustee's deed was issued on December 21, 1987.

In the interim between the assignment from Diane to George Jr. and the sale, an important event took place. George Jr. called Frost, claiming that the interest that had been assigned to him in Hanson Acres was his free of any claims by Alta. George Jr. stated that he had received the interest in payment of a debt which George Sr. owed him in another transaction.[3]

Frost discussed George Jr.'s claim with George Sr.[4] Both Frost and George Sr. agree on the following aspects of this discussion:

1. That George Sr. was upset and said he had to do something right away.

2. That Frost stated he would not become involved in a lawsuit brought by Alta or George Sr. against George Jr.

3. That Frost warned George Sr. that there was a possibility that George Jr. could sell the note which was in his name to an innocent third party who might have a legitimate claim to it.

4. That Frost promised he would place any money claimed by George Jr. from a sale or lease of the property in Frost's trust account or with the court pending resolution of claims to the money.

It is disputed whether Frost advised George Sr. to consult with another attorney. Frost claims he gave such advice and George Sr. claims he did not. In any case, George Sr. consulted with another attorney concerning George Jr.'s claim soon after his meeting with Frost. George Sr. testified that thereafter he felt comfortable with what Frost had told him.

It is also disputed whether Frost warned George Sr. that any lawsuit he might bring might prompt SeaFirst Bank to foreclose on its deed of trust. George Sr. claims that Frost told him this. Frost states that he did not tell George Sr. not to file suit, but told him "don't go off half-cocked, whatever you do, make sure it's with the advice of an attorney...." According to Frost, he was not concerned about George Sr. filing suit and a *lis pendens* against George Jr. because such a suit would not have damaged a sale so long as there were assurances that the *lis pendens* could be released upon deposit of the disputed portion of the funds in court.

Frost also testified that he had the following consultation with George Sr. about whether to continue with the foreclosure or stop:

[I]t doesn't matter one iota one way or another, if you want me to continue on it, then I'm going to be representing George Barth, Jr., he's going to continue to sign the documents as he has before and the only protection I can give you is

---

3. George Sr. acknowledged that George Jr. had given him $10,000 to invest in the Cayman Islands, but that "I don't recall what it went for.... I think I invested it in real property."

4. The evidence is in conflict as to when Frost and George Sr. first discussed George, Jr.'s claim. Frost placed the discussion in October, while George Sr. thought it took place earlier, perhaps in late July or early August, 1987.

to tell you if any funds come in from the sale that I'm negotiating at the same time—that we're negotiating, then those monies will be placed into a court account. . . .

George Sr.'s account of the discussion does not contain Frost's offer to either withdraw from the foreclosure or continue with the foreclosure and sale negotiations.

Prior to the foreclosure sale, Frost began to negotiate with prospective lessees and purchasers of Hanson Acres.[5] Frost also negotiated with SeaFirst and obtained an extension for the repayment of the loan it was administering.

On the day of the sale, December 10, 1987, Frost dictated a letter to George Sr. discussing the conflict between George Jr., on the one hand, and Alta, George Sr. and Peter Barth on the other. The letter states in part: "I do not represent Alta Corporation, you, or Peter Barth in this matter. I represent the holders of the Deed of Trust, namely John, Tom and George Barth, Jr., as well as the Law Offices of Frost & Grashin." The letter does not state that the foreclosure sale had taken place. The letter was sent on December 15, 1987, to George Sr.'s address on Grand Cayman Island. He did not receive it until March of 1988.

While George Sr. claims that he did not know of the foreclosure sale until after it was held, and Frost asserts that George Sr. knew about the sale at all times, it is clear that Frost and George Sr. discussed the sale, in George Sr.'s words, "right after the foreclosure."[6] Thereafter, he and Frost

acted together in trying to sell Hanson Acres.

In January of 1988 George Sr. and Frost met with prospective purchasers. According to George Sr., at the conclusion of a meeting in late January of 1988 or early February, Frost told George Sr., "I'm not representing you, I'm representing the owners of record which are Tom, John, George Barth, Jr., and the law firm of Frost and Grashin."[7] After this conversation George Sr. contacted another attorney, Michael Lindeman, who on February 3, 1988, filed suit against George Jr. and recorded a *lis pendens* on Hanson Acres. Frost did not appear in this litigation on behalf of any party.

On February 3, 1988, AmVets Post 2 made an offer to purchase the Hanson Acres property for a total price of $395,-000, contingent on approval of a liquor license transfer. This offer included paying the deed of trust note administered by SeaFirst, the balance of which was then about $270,000.

On February 26, 1988, Frost wrote a four-page letter to Lindeman, George Sr.'s attorney. After summarizing his view of events, Frost advocated acceptance of the AmVets offer. He noted that while George Jr. would stipulate to the deposit in court of all funds attributable to the Alta/George Jr. disputed share in exchange for a release of the *lis pendens*, Frost understood that George Sr. would not agree to this. Instead, George Sr. would insist that funds for the undisputed shares also be deposited in court. Frost conjectured that this could result in the frustration of the sale. Frost continued:

> When we were introduced at the . . . meeting by the Alaska Youth and Parent Foundation's director, you were introduced as a part owner. You looked at me with some surprise and I shook my head "no," indicating that we would not correct them on the record. This is because I did not want to embarrass you as I did not know what you had represented your position to be.
> After the meeting I once again made it clear to you that you were not an owner and you seemed to readily agree with that.

---

5. At George Sr.'s request, the property was listed with Cher Gamblin, a real estate agent who was also the sister of George Sr.'s live-in companion. Gamblin was involved in these negotiations.

6. George Sr. was twice asked by bar counsel what his reaction or response was to the news of the sale. He stated that he did not have any reaction or "emotions one way or another. . . . I just thought that he—he'd done a foreclosure for us and we had to go forward with—getting a tenant for the building."

7. Frost in a letter dated February 4, 1988, to George Sr. described the incident this way:

If the closing does not take place, Sea-First has advised me that it will bringing [sic] a judicial foreclosure action against Peter Barth, John Barth, Tom Barth, and Virginia Gaylen. Alta Corporation should reconsider its "trust" relationship with Peter Barth when risking this eventuality with the *lis pendens*. Of course, if the closing does not occur I fully intend to bring legal action against George Barth, Sr. on behalf of Frost & Grashin, if not the other owners, for all losses arising from the failure of the transaction to close as a result of George Barth, Sr.'s or Alta's actions. If a counterclaim is asserted or any claim is asserted against me personally, you are fully aware that that waives all attorney/client privileges and this matter could become messy and ugly. I have insurance to cover my legal fees and expenses and I can assure you that the litigation will not be pleasant for anyone. I hope this does not become necessary.

In April 1988 AmVets withdrew its offer as it was unable to obtain approval for transfer of its liquor license to the Hanson Acres location. On May 26, 1988, George Sr. filed a grievance against Frost. Peter's grievance followed on July 15th. On July 10 and 11, 1988, Frost notified Cher Gamblin, the real estate agent, and the other record owners of the property that due to the allegations being directed against him by George Sr. he would no longer take a lead role in attempting to sell the property.

On January 13, 1989, the superior court ordered reconveyance of George Jr.'s interest in Hanson Acres to Alta in trust for Peter Barth. In the spring of 1990 Sea-First's foreclosure of its deed of trust was completed and the interests of the Barths and Frost in Hanson Acres were extinguished.

In summary, the facts show the successful non-judicial foreclosure of a second deed of trust held by a number of beneficiaries who acquired title at the foreclosure sale. Subsequent efforts by the beneficiaries to sell the property were unsuccessful and their interests were extinguished by foreclosure of a first deed of trust. The dispute as to ownership of a fractional beneficial interest in the deed of trust, and later, the property, had no effect on the foreclosure; whether the ownership dispute affected the beneficiaries' ability to sell the property is uncertain.

## III. *VIOLATIONS FOUND BY THE COMMITTEE*

The committee found that Frost had committed acts of misconduct in connection with Counts I through III and IX of the ten-count petition. For convenience, we first summarize the acts of alleged misconduct, then set out the committee's findings.

Count I—Frost should have declined to act as counsel in the non-judicial foreclosure because the exercise of his independent professional judgment on behalf of the beneficiaries possibly could be affected by his own financial interest in the property and because Frost did not make a full disclosure of the potential for conflict. This violated DR 5–105(A).

Count II—When George Jr. claimed to be the owner of the note and deed of trust free of any claim by Alta, an irreconcilable conflict was created which required Frost to resign as attorney for the beneficiaries in the non-judicial foreclosure and in their efforts to sell the property. Frost's failure to resign violated DR 5–105(B).

Count III—Frost did not make a full disclosure of the differing interests of the beneficiaries, including his own interest as a beneficiary, at the outset of his employment as counsel in the foreclosure, and developed an irreconcilable conflict once George Jr. expressed his independent claim which required Frost to withdraw. This violated DR 5–104(a).

Count IX—Frost's letter of February 26, 1988, to George Sr.'s attorney, Michael Lindeman, stating that if a counterclaim or claim was asserted against Frost then "all attorney/client privileges" would be waived, was a use of a client confidence or secret for the advantage of Frost, in violation of DR 4–101(B)(3).

The findings of the committee which the committee cited in support of the above conclusions are as follows:

11. [Applicable to Count III] On or before April 17, 1987, George Barth, Sr. and Alta retained Frost to commence and complete a non-judicial foreclosure of the second deed of trust. This relationship was confirmed in a letter to George, Sr. from Frost dated April 17, 1987 (**Exhibit 20**) wherein Frost advises that he will "bring the foreclosure action on behalf of Alta and Frost and Grashin, and will evenly split the legal costs and legal fees with you." Although this letter does reference the fact that Frost will be pursuing the action in part on his own behalf, Frost never made full disclosure of the possibility that his personal, business interest might diverge from that of George, Sr. or Alta, that such divergence might affect Frost's professional judgment on behalf of George, Sr. or Alta, and that the consent after disclosure of George, Sr. and Alta was therefore required before Frost could proceed. Frost was negligent in failing to realize at the outset that his personal interest in the foreclosure required such complete disclosure to and the informed consent of his client. Frost negligently concluded that because the foreclosure would extinguish Gaylen's interest in the property and permit it to be sold by the note holders, foreclosure was in the interest of all. Frost negligently failed to realize that the foreclosure might affect persons with recorded interests in the property like Frost differently than those with unrecorded claims to the property like Alta or George, Sr. George, Sr. was billed by Frost for one-half of the attorney's fees incurred in the foreclosure proceeding from April through the end of December, 1987. George, Sr. was, in Frost's words, the "driving force" behind the foreclosure. George, Sr. was not a mere guarantor of payment of the attorney's fees incurred in the foreclosure.

. . . .

14. [Applicable to Count III] On or before June 5, 1987, Frost formed an attorney-client relationship with Thomas R. Barth whereby Frost was to undertake the non-judicial foreclosure of the Hanson Acres property, make efforts to negotiate a sale of the property, and negotiate with SeaFirst for extension of time for payment under the note held by the State of Alaska which was secured by the property. Prior to that date he had consulted with Thomas' counsel, Roger DuBrock regarding such representation. On June 5, 1987, he met with Thomas who signed the substitution of trustee, the beneficiaries' affidavit, and a consent to representation appended to a letter to him dated May 27, 1987, from Frost (**Exhibit 26**). On or before August 14, 1987, Frost entered into an attorney-client relationship with George, Jr. for the same purposes. As discussed *infra*, George, Jr. had by that time received an assignment of Diane's interest in the Gaylen note and deed of trust. George, Jr. executed the same documents as Thomas on August 14, 1987. On or about August 18, 1987, Frost entered into an attorney-client relationship with John R. Barth for the same purposes as described above for the relationship with Thomas and George, Jr. John, through his attorney-in-fact Gerald Barth, executed the same documents as Thomas and George, Jr. on that date. The dates next to the signatures of Thomas and John on the consent form (**Exhibit 26**, page 4) are in Frost's handwriting and do not establish the date that they signed that document.

15. [Applicable to Counts I and II] Though Frost's letter of May 27, 1987 (**Exhibit 26**) sets forth some facts concerning his own interest and the interest of Thomas, George, Jr., and John, Frost never made full disclosure of the possibility that his personal, business interest might diverge from that of Thomas, George, Jr. and John, that such divergence might affect Frost's professional judgment on behalf of Thomas, George, Jr., and John, and that the consent after disclosure of Thomas, George, Jr., and John, was therefore required before Frost could proceed. Frost was negli-

gent in failing to realize at the outset that his personal interest in the foreclosure and attempts to sell the property required disclosure to and consent of these clients. Frost also never made full disclosure of the potential for conflict between George, Sr., Alta, Thomas, George, Jr., John, and Frost, as multiple clients, that such multiple interests might affect Frost's professional judgment on behalf of each of those persons, and that the consent after disclosure of each of those persons was therefore required before Frost could proceed. Frost was negligent in failing to realize at the outset that these multiple interests, particularly those of the non-record claimants of an interest in the property and those of the record owners of interest in the property, might conflict and diverge and that therefore disclosure to and consent of all of his clients was required. In fact, the interests did subsequently conflict and diverge.

. . . .

18. [Applicable to Counts II and III] At least one month prior to December 10, 1987, George, Jr. called Frost to tell him that he, George, Jr., considered his interest in the note and deed of trust to be his own property free of any claim by Alta or George, Sr. George, Jr. advised Frost that he had received the interest in payment of a debt by his father to him arising from another transaction. Frost considered at some length the conflict presented by this claim of George, Jr.

19. [Applicable to Count II] The assertion of this claim by George, Jr. created an irreconcilable conflict which required Frost to withdraw from the attorney-client relationship he had formed with George, Sr., Alta, Thomas, John, and George, Jr. involving the foreclosure of the property, effort to sell the property, and effort to procure extensions on the note and deed of trust from SeaFirst. George, Jr.'s interest was to proceed with the foreclosure which would result in title to the property vesting in George, Jr. in part. This would give him control along with Thomas, John, and Frost, of the property thereby facilitating its sale and rental in accordance with terms to his liking. George, Sr.'s interest was to immediately commence suit against George, Jr. seeking to establish that George, Jr. held his interest in some way for George, Sr. and to immediately record a *lis pendens* in connection with such suit. Such action was required by George, Sr. in order to avoid superior positions arising in third parties to whom George, Jr. might sell and convey his interest in the note and deed of trust and to prevent the record owners from arguing that he waived his claim by allowing the foreclosure to proceed with his knowledge and without objection to title vesting in George, Jr. The *lis pendens* was further necessary to insure that any sale of the property by the record owners after foreclosure would not vest title in a bona fide purchaser for value who would have a superior claim to the property to George, Sr. While George, Sr.'s interest may ultimately have been to consent to the foreclosure or sale of the property, a complex tactical evaluation by an independent lawyer for George, Sr. was required before his cooperation in these two matters could safely be said to be in George, Sr.'s interest.

20. [Applicable to Count III] The claim of George, Jr. also resulted in an irreconcilable conflict between Frost's personal, business interest and those of his client George, Sr. Frost's interests, as a record owner, were similar to those of George, Jr.'s and were in conflict with those of his client, George, Sr., for the same reasons outlined above.

21. [Applicable to Counts II and III] Frost did not withdraw from the representation of any of his clients in the foreclosure matter. Frost did not disclose to the trustee that a dispute as to the ownership of the beneficial interest in the deed of trust had arisen. The foreclosure sale was held on December 10, 1987 and Land Title Company executed and recorded on December 21, 1987 a trustee's deed to the property prepared by Frost (**Exhibit 42**) which vested the

fee simple title to the property in Frost, Thomas, John, and George, Jr.

....

23. [Applicable to Counts II and III] According to Mr. Frost's billings (**Exhibit J**, page 24), Frost dictated a letter to George, Sr. on December 10, 1987, and a letter dated December 15, 1987 (**Exhibit 40**) was received in evidence. Frost has described this document as a "CYA letter" and given its date, it is the best evidence of Frost's actions in the foreclosure matter in the latter part of 1987. Though the letter discusses a "very demanding call from George Barth, Jr." in which George, Jr. claimed the deed of trust as his own property, the letter does not state that this problem had been discussed with George, Sr. at any time previously and in particular does not assert that the subject was discussed at a meeting between George, Sr. and Frost which both George, Sr. and Frost's billings indicate occurred on December 4, 1987. Moreover, despite being written the day of the foreclosure and dated five days thereafter, the letter does not disclose that the foreclosure sale has occurred and does not state that a copy of the proposed trustee's deed was enclosed. The letter inferentially suggests that the sale has not occurred since it refers to the continuing negotiability of the note, beneficial holders of an interest in the deed of trust, and the difficulty, in the present tense, of handling the foreclosure. Finally, the explanatory letter to the Association dated July 29, 1988 (**Exhibit 74**, p. 5 second paragraph) suggests that the letter of December 15, 1987 advises that the named beneficiaries will be the named owners on the trustee's deed when in fact the letter does not even reference the trustee's deed. Given the proximity of the preparation and date of the December 15th letter to the date of the foreclosure sale, Frost's failure to disclose that the foreclosure sale had occurred can only have been intentional. The letter evidences an intent to create the appearance of timely and full disclosure of the claim of George, Jr., the conflict which arose from that claim, and the need for George, Sr. to have separate counsel while at the same time not disclosing information about the conclusion of the foreclosure sale and the pending execution of the trustee's deed by the title company. Despite the conflict in the testimony between George, Sr. and Frost, there is therefore clear and convincing evidence that Frost knew of the conflict presented by the claim of George, Jr., knowingly did not disclose that conflict to George, Sr. in a timely enough manner to allow George, Sr. to block completion of the foreclosure sale if he so desired, and knowingly failed to withdraw from representation of any of the parties in the foreclosure. These actions were taken with the intent to assist Frost and the record owners of the note and deed of trust in becoming vested in title to the property by virtue of the trustee's deed.

....

25. [Applicable to Counts II and III] Sometime in January of 1988, George, Sr. discussed the claim of George, Jr. with Frost who refused to proceed against George, Jr. George, Sr. retained Michael Lindeman who immediately filed a complaint on his behalf against George, Jr. and recorded a *lis pendens* against the property. (**Exhibit 47**.) Frost, meanwhile, continued to represent Thomas, John, George, Jr., and himself in efforts to find a purchaser for the property and to obtain a conditional use permit from the Municipality of Anchorage.

....

27. [Applicable to Count IX] On February 26, 1988, Frost wrote to Lindeman (**Exhibit 53**) discussing Frost's efforts to sell the property and requesting that George, Sr. release his *lis pendens* under certain conditions proposed by Frost. That letter contains the following paragraph:

> If we fail in this endeavor, the closing will not take place. If the closing does not take place, SeaFirst has advised me that it will bringing [sic] a judicial foreclosure action against Peter Barth, John Barth, Tom Barth and Virginia

Gaylen. Alta Corporation should reconsider its "trust" relationship with Peter Barth when risking this eventuality with the *lis pendens*. Of course, if the closing does not occur I fully intend to bring legal action against George Barth, Sr. on behalf of Frost and Grashin, if not the other owners, for all losses arising from the failure of the transaction to close as a result of George Barth, Sr.'s or Alta's actions. *If a counterclaim is asserted or any claim is asserted against me personally, you are fully aware that that waives all attorney/client privileges and this matter could become messy and ugly. I have insurance to cover my legal fees and expenses and I can assure you that the litigation will not be pleasant for anyone. I hope this does not become necessary.* [emphasis added.]

Frost expected that a copy of this letter would be provided to George, Sr. or that its substance would be conveyed by Lindeman to George, Sr. Frost concedes that the third to the last sentence is inaccurate because only confidences pertaining to the particular matter on which the lawyer is being sued would be permitted to be revealed by the lawyer in defense of himself. Frost knew that George, Sr. would probably react emotionally to the underlined statements in this letter (as in fact he did). Frost knowingly used confidences of his client, George, Sr., to the disadvantage of George, Sr. with the intent of discouraging George, Sr. from bringing claims against Frost and encouraging him to cooperate in the sale of the property as proposed by Frost.

## IV. *DISCUSSION*

### A. **Count I**

Disciplinary Rule 5–105(A) provides:

A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a

client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

DR 5–105(A) addresses the situation confronting a lawyer when first considering employment on a particular undertaking. At that point the lawyer must ask whether accepting the new undertaking will likely affect his or her professional judgment in a prior and pending undertaking. If the answer to that question is in the affirmative, the lawyer must decline to take the new employment. If the lawyer obviously can adequately represent the interests of each client, the lawyer may undertake the new employment after full disclosure to each client if each client consents to the representation. DR 5–105(C).

■ The committee did not give sufficient consideration to the threshold requirement of DR 5–105(A), which is that the lawyer's exercise of independent professional judgment *"will be or is likely to be adversely affected by the acceptance of new employment."* (Emphasis added.) Finding 15 merely notes the "possibility" of a divergence of interest and later states that the multiple interests of the various beneficiaries "might affect" Frost's professional judgment and that the various multiple interests "might conflict and diverge." The committee did not find that there was a likelihood that Frost's independent professional judgment on behalf of existing clients would be adversely affected by his undertaking on behalf of the deed of trust beneficiaries in this case. It is our view that such a likelihood did not exist. Promptly foreclosing, taking control of and selling the property was in all of the beneficiaries' best interest.[8]

### B. **Count II**

Disciplinary Rule 5–105(B) provides:

A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf

---

**8.** Frost did disclose to all the beneficiaries his ownership of one of the notes secured by the second deed of trust.

of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

Like DR 5–105(A), this rule is subject to the DR 5–105(C) exception, which applies in cases where adequate representation of conflicting interests obviously can be afforded, assuming all clients consent after full disclosure.

■ The committee found that when George Jr. claimed that his interest in the note and deed of trust was his own property, this "created an irreconcilable conflict which required Frost to withdraw...." We do not agree that Frost's only option, once George Jr. revealed his claim, was to withdraw from continued participation as an attorney for the beneficiaries in the non-judicial foreclosure and in their efforts to sell Hanson Acres after the foreclosure.

It would have been acceptable for Frost to notify George Sr., George Jr., and the other beneficiaries of the conflict; assert that he would not become involved in its resolution; and state that he would nevertheless continue to oversee the non-judicial foreclosure and the efforts to sell the property. Frost contends that he did precisely this. George Sr. does not contradict him.

In the foreclosure and attempted sale of the property, Frost's professional judgment was not likely to be adversely affected by his representation of the beneficiaries collectively because such actions were in all of the beneficiaries' interest.[9] Here again, given Frost's limited undertaking on behalf of the beneficiaries, the threshold requirement for a DR 5–105(B) violation, likelihood that the lawyer's independent professional judgment will be adversely affected by multiple representation, has not been demonstrated.[10]

## C. Count III

Disciplinary Rule 5–104(A) provides:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The misconduct found by the committee with respect to Count III is a combination of the misconduct found by the committee with respect to Counts I and II: Frost should have advised each of the beneficiaries of the potential conflict and Frost should have withdrawn once George Jr.

**9.** Frost would have been in a conflict situation had he taken a position in the ownership dispute between George Sr. (Alta) and George Jr. Instead, it is undisputed that Frost refused to become involved in that controversy, but did advise George Sr. of the risk that George Jr. might transfer his interest to an innocent third party.

**10.** The suggestion in Committee Finding 23 that Frost did not discuss George Jr.'s claim with George Sr. in a timely fashion is not supported by any evidence. Both Frost and George Sr. acknowledge that such a discussion took place in the summer or fall of 1987. The committee's suggestion in the same finding that Frost attempted to conceal the fact and the date of the foreclosure sale is not supported either by clear and convincing evidence or by a preponderance of the evidence. Frost's monthly billings, which were sent to George Sr., are entitled "Foreclosure v. Gaylen." George Sr. testified that he was familiar with non-judicial foreclosure procedures and thus would have been expected to know the significance of such entries as "prepared foreclosure documents, ordered title report" (May 21, 1987), a disbursement for the "trustee's sale GTY" (June 1, 1987), and a dis-

bursement for "recording fee— ... notice of default" (August 24, 1987). George Sr. acknowledged receiving the letter of April 17, 1987, which states that the foreclosure will proceed. In September of 1987, George Sr. gave Frost a power of attorney to act for George Sr. and Alta in connection with the deed of trust and the Hanson Acres property. The power of attorney contains an expiration date of December 15, 1987, a date selected, according to Frost, because the sale was scheduled for December 10th and the additional five days were thought to be all that would be necessary to obtain title documents following the sale. Prior to the sale, Frost was working closely with a real estate agent who was the sister of George Sr.'s live-in companion and who had been selected by George Sr. In these efforts the fact of the anticipated December 10th foreclosure sale played a dominant role. Finally, George Sr. testified that right after the foreclosure sale he discussed it with Frost. Although invited by bar counsel to relate what his emotions were at that point, George Sr. did not state that he was in any way surprised by this discussion.

asserted his claim.[11] For the reasons given with respect to Counts I and II, this count is rejected.

### D. Count IX

Disciplinary Rule 4–101(B)(3) states:

Except when permitted under DR 4–101(C) and (D), a lawyer shall not knowingly during or after termination of the professional relationship to his client:

. . . .

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

■ The committee found that Frost's assertion in his February 26, 1988, letter to George Sr.'s attorney that a claim brought by George Sr. against Frost would "waive all attorney-client privileges" was a use of confidences or secrets of George Sr. for the advantage of Frost. Frost has neither briefed nor argued that DR 4–101(B)(3) may not be applied to an implied threat to reveal a confidence. We therefore accept the view of the bar that such application is appropriate. As the fact of the letter is undisputed, we accept the recommendation of the board and find that Frost violated DR 4–101(B)(3).

### V. *SANCTIONS*

■ In determining appropriate sanctions, this court is guided but not constrained by the American Bar Association Standards for Imposing Lawyer Sanctions (1986). *In re Schuler*, 818 P.2d 138, 139 (Alaska 1991). Under these Standards, after a finding of lawyer misconduct, the court should consider the following factors:

(a) the duty violated;

(b) the lawyer's mental state;

(c) the actual or potential injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

ABA Standards, ABA/BNA at 01:805–06; *see also, id.* at 01:815.

Using the Standards' framework, the duty violated by Frost was the duty owed to clients, which most closely falls within paragraph 4.2 of the Standards, "Failure to Preserve the Client's Confidences."[12] While Frost did not reveal any information relating to his representation of George Sr., the implied threat to reveal confidential information is itself unethical conduct. *In re Dienes*, 118 N.J. 403, 571 A.2d 1303, 1303 (1990) ("No lawyer ... should use a threat to disclose confidential information to obtain a favorable legal result.").

Frost's mental state appears to us to be a neutral factor in the question of sanctions. Frost's action was deliberate. However, when he wrote the letter Frost was understandably perturbed at George Sr. for taking the unreasonable position that all sale proceeds be deposited in court, rather than merely those proceeds prorated to the contested George Jr./Alta share. This position, according to Frost, eliminated any possibility that the sale would take place, as George Sr.'s brothers Tom and John would not agree to have their portion of the proceeds placed in court.

As for the third factor, Frost's implied threat caused no actual injury to George Sr. Further, the potential to cause injury to George Sr. was quite slight since, as Frost testified, he did not know confidential information which might be damaging to George Sr. in any case.

The Standards list factors which may be considered in aggravation and mitigation of recommended sanctions. Standards 9.2, 9.3, 01:838–41. Most of these factors do not apply to Frost's case. Those that do apply are essentially offsetting. Substan-

---

**11.** The undisputed facts concerning the disclosure made by Frost to George Sr. concerning George Jr.'s claim are set forth above on pages 6 and 7.

**12.** None of the ABA proposed sanctions exactly applies to Frost's misconduct. The closest one to Frost's case is 4.24, which states:

Admonition is generally appropriate when a lawyer negligently reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed and this disclosure causes little or no actual or potential injury to a client.

tial experience in the practice of law is an aggravating factor under Standard 9.22(i). This applies to Frost's case as he is an experienced attorney. This factor is, however, offset by the mitigating factor of absence of a prior disciplinary record. Standard 9.32(a).

 The listing of factors in aggravation and mitigation is not exclusive. We regard Frost's offense as mitigated for two reasons. First, what he stated in the letter varied only slightly from what he would have been permitted to say. It would not have been ethically wrong for him to have stated that if George Sr. presented a claim against him, this would amount to a waiver of the attorney/client privilege to the extent necessary for Frost to defend himself. Such a statement would have been permissible under DR 4–101(C)(4). Frost's actual statement was not limited by the "necessary to defend" qualification and thus was overbroad. Second, the implied threat was not made in a letter to George Sr. Instead, the letter was written to George Sr.'s counsel, who could advise George Sr. as to the limits of any disclosure which Frost might be permitted to make.[13]

## VI. *CONCLUSION*

For the above reasons we reject the Disciplinary Board's recommendations respecting Counts I, II and III. We accept the recommendation of the Disciplinary Board

concerning Count IX. Pursuant to Bar Rule 16(a)(4) we shall administer a sanction of public censure against Frost.[14]

BURKE, J., with whom COMPTON, J., joins, dissents.

BURKE, Justice, with whom COMPTON, Justice, joins, dissenting.

I dissent from today's decision because I believe the record supports the hearing committee's findings that Frost violated Disciplinary Rules 5–105(B), 5–104(A) and 4–101(B)(3) as set forth in counts II, III and IX, respectively, of the petition.[1] Accordingly, I believe that the sanction imposed by this Court is inappropriate, given the severity of Frost's violations.

After reviewing the record and considering the American Bar Association's Standards For Imposing Lawyer's Sanctions, I concur with the disciplinary board's recommendation that Frost be suspended from the practice of law for a period of eight months and that he take and pass the MPRE before he is readmitted to practice law in Alaska. I would remand to the disciplinary board's liaison member to determine the appropriate award of costs and attorney's fees.

---

**13.** Frost aptly reviewed most of the factors relevant to sanctions for the implied threat in his statement to the Disciplinary Board:

> I mean I was angry number one, and I wasn't thinking real clearly. And I think, number two, he has such a history of litigation. I mean in my mind I'm just—us going through that kind of battle I—I—when I said that, I was thinking of his history. His litigation history.... I mean I don't have—to this day I don't know of any confidences. And I testified to that.... I didn't know of any at the time. Why did I say all, it was just stupid. You know. And it was to an attorney and it didn't have any effect. I mean stopping George Barth from litigating, you know, is like trying to stop a waterfall....
> [T]here's nothing wrong with trying to stop somebody from suing you ... and stating what your legal right is. If I said, if you're going to sue me, I'm going to counterclaim for this, this and this, well that's fine. Nothing wrong with that. And if I said if you sue

me, I'm going to utilize every defense available to me, that's fine. Okay? We are all in agreement on that. And if I say, I even get to use some confidences if they're related to my defense, that's okay for me to say that. I said "all," and that's wrong. That's a very sm— half step, I'll put to you.... And, frankly, you should slap my hands for it. But I've admitted that since day one....

**14.** We do not accept the committee's recommendation that Frost be required to pass the MPRE. We vacate the award of the costs and attorney's fees assessed against Frost and order that the parties each bear their own costs and attorney's fees. Finally, we note that we have reviewed the other contentions raised by Frost and find them to be without merit and that our disposition herein moots the bar's appeal.

**1.** I agree with the majority that the record does not support a finding that Frost violated DR 5–105(A).