**In the DISCIPLINARY MATTER OF Elliott FRIEDMAN, Attorney, Respondent.**

No. S–8542.

Supreme Court of Alaska.

May 8, 2001.

As Corrected on Denial of Rehearing June 7, 2001.*

---

* CARPENETI, Justice, dissenting in part. He would grant the Motion for Stay. BRYNER, Justice, dissents in part. He would grant the Petition for Rehearing and the Motion for Stay.

James D. Gilmore, Gilmore & Doherty, Anchorage, for Elliott Friedman.

Mark Woelber, Assistant Bar Counsel, Alaska Bar Association, Anchorage.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Attorney Elliott Friedman, acting for all plaintiffs in a complex tort suit, deposited an $81,000 settlement contribution in his client trust account. Without permission from the other plaintiffs' attorneys, he drew on the trust account to advance funds to his client and to pay himself attorney's fees not yet due him. He also drew on the trust account to pay himself fees in the matters of five other claimants before he had deposited the settlement funds in those matters. These payments breached fiduciary duties he owed the other plaintiffs in the tort suit and put the account out of trust. The Alaska Bar Association's hearing committee, finding violations of five disciplinary rules, recommended a six-month suspension from practice and a year of probation. The bar's disciplinary board adopted most of the com-

mittee's findings. But, finding that Friedman had acted with selfish motives, it recommended a four-year suspension. Although we agree substantially with the board's sanction analysis, our precedents and our independent evaluation of Friedman's mitigating conduct compel a slightly reduced sanction. We therefore order Friedman suspended for three years.

## II. FACTS AND PROCEEDINGS

### A. Facts

The sinking of the F/V UYAK II in 1987 caused the deaths of most of her crew. The decedents' estates and the survivors sued the vessel's owner, Cal–Alaska Fisheries, Inc. Elliott Friedman represented the estate of decedent Rodrigo Jaime. Other attorneys represented the other plaintiffs.

The case was complex, and the plaintiffs' attorneys decided to pursue a global settlement. Disputes about Cal–Alaska's insurance coverage complicated the settlement. Friedman, as de facto leader of the plaintiffs' attorneys, eventually negotiated a settlement on behalf of all claimants for a lump sum of about $670,500, of which Cal–Alaska itself was to contribute $81,000.

Concerned that Cal–Alaska might not pay its share, the plaintiffs' attorneys attached special importance to collecting Cal–Alaska's contribution. Cal–Alaska sent its $81,000 contribution to Friedman on May 23, 1990, with a letter from Cal–Alaska's counsel stating that the "check ... is to be held in trust by you for further distribution in accordance with the terms and conditions of the Settlement Agreement." The check stated: "Settlement Payment by Cal–Alaska Fisheries, Inc. to be held in trust per settlement agreement of *West of England, et al., v. Cal–Alaska Fisheries, Inc., et al.,* Cause No. C88–398C (USDC)." On May 25 Friedman deposited the check in his client trust account pending receipt of the remaining set-

tlement contributions and agreement among the plaintiffs on how to divide the settlement proceeds. Friedman believed that he would receive the remaining settlement contributions within sixty days. But disagreements among the plaintiffs on how to allocate the lump-sum settlement proceeds delayed payment of the remaining contributions for nearly a year. As of May 19, 1990, the plaintiffs had not agreed on how much each was to receive; the plaintiffs did not reach agreement until May 1, 1991. The other settlement contributors then paid their shares. Friedman did not receive the last contribution until late May 1991; he deposited it in the trust account soon thereafter.

On May 29, 1990, four days after Cal–Alaska's contribution was deposited in his client trust account and about one year before the remaining settlement contributions were deposited in his trust account, Friedman wrote a $15,000 check on the account for partial payment of fees he had "earned" and costs he had advanced in the *UYAK II* case and in an unrelated case. The bar's hearing committee later found that Friedman had personally prepared this check. A week later he signed a check on the trust account to advance his *UYAK II* client $10,000. On December 13, 1990 he signed a $6,000 trust account check to pay himself an additional $3,000 in fees in *UYAK II*.

Friedman had no permission from the other *UYAK II* plaintiffs' attorneys to draw on Cal–Alaska's $81,000 contribution when he paid himself fees and advanced funds to his client in May, June, and December 1990.

In late 1990 and early 1991 Friedman signed seven client trust account checks paying himself attorney's fees in five other claimants' matters unrelated to the *UYAK II* suit. As to each of those matters, the funds settling the matter had not yet been received or deposited in the trust account when he signed the check.[1] In effect, Friedman used

---

1. (1) The December 13, 1990, check for $6,000 that paid Friedman fees of $3,000 in *UYAK II* also included fees for the *Bear* matter. Not until February or March 1991 were *Bear* settlement proceeds deposited in the trust account or paid to the *Bear* client. (2) In November 1990 Friedman signed a $14,600 trust account check in part

to pay himself fees in the *Goeckel* matter, but settlement proceeds in *Goeckel* were not received before late December 1990.(3) In late December 1990 Friedman signed a trust account check for $8,000 to pay himself fees in the *Whitt* and *Hamilton* matters. Friedman did not deposit the *Whitt* settlement funds or pay his client any part

trust funds being held for the *UYAK II* settlement to pay himself fees in these five non-*UYAK II* matters and replaced the *UYAK II* funds as the settlement checks in those five matters were received and deposited in the trust account.

These draws caused the trust account to be "out of trust." At one point in early 1991, the balance was only $8,583.29, although the trust account should have contained at least $81,000 awaiting final distribution to all the *UYAK II* claimants.

### B. *The Disciplinary Proceedings*

In May 1992 counsel for another *UYAK II* claimant filed a bar grievance, alleging that Friedman had promised to place the $81,000 in a segregated, interest-bearing account. When bar counsel asked Friedman to respond to the allegation, Friedman denied it; he claimed that he had deposited the money in his trust account as required by law and had not used the money for any purpose. Bar counsel continued to request and receive information from Friedman about his bank accounts. Bar counsel eventually filed a petition for formal hearing. After Friedman answered the petition, bar counsel moved for summary judgment on all counts. Friedman opposed the motion and cross-moved for summary judgment.

The hearing committee granted summary judgment. It found that Friedman did not maintain the Cal–Alaska $81,000 settlement contribution in trust "as the express terms of his trust required him to do." It found that the trust account had a minimum balance of $67,543 to $42,106 between September 29 and December 31, 1990. At one point some months before Friedman received permission to draw on the *UYAK II* trust money, the balance dropped to $8,583.29. The commit-

tee also found that Friedman had failed to account for and distribute some interest earned on the *UYAK II* settlement money. It noted that Friedman correctly believed the Jaime estate would be entitled to substantially more than the amount he had advanced to it and that his total fees in *UYAK II*, based on the total settlement, exceeded the fees he paid himself in May and December 1990. It found that Friedman violated: (1) Disciplinary Rule (DR) 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation) through the attorney's fee and client advances in *UYAK II* and the other five matters; (2) DR 1–102(A)(5) (conduct prejudicial to the administration of justice) through his improprieties within the context of litigation, based on these same acts; (3) DR 9–102(A) (lawyer's management of money held in trust for others) based on these same acts; (4) DR 1–102(A)(3) (illegal conduct involving moral turpitude) because his conduct amounted to the criminal act of misapplication of funds; and (5) DR 6–101(A)(3) (neglect of a legal matter) by failing to disburse the excess settlement funds and by failing to account for one party's interest on funds (although the committee declined to find this conduct was intentional).[2] The committee granted Friedman summary judgment on the allegation that he had engaged in conduct adversely reflecting on his fitness to practice law.

The committee then considered the issue of sanctions. Following a hearing at which Friedman testified at length, it recommended a six-month suspension, a one-year probationary period, and periodic auditing of Friedman's client trust account.

Bar counsel appealed the committee's recommendation to the bar's disciplinary board and Friedman cross-appealed from the sum-

---

of the *Whitt* settlement until mid-February 1991. Friedman did not deposit the *Hamilton* settlement funds, make an accounting to his client, or pay her any part of the *Hamilton* settlement before late February .(4) In January and early February 1991 Friedman signed four trust account checks totaling $51,500 payable to himself; his books allocated them as payment for fees in the *Mathias* matter, but Friedman did not deposit the *Mathias* settlement funds until late February 1991. He also paid the *Mathias* client $1,500 from the trust account about four weeks

before he deposited the *Mathias* settlement proceeds.

**2.** These provisions were part of the disciplinary rules, embodied in the Code of Professional Responsibility, that applied when the Friedman transactions took place. The Code has since been superseded by the Alaska Rules of Professional Conduct, which became effective July 15, 1993. *See* Alaska Supreme Court Order No. 1123 (April 14, 1993).

mary judgment entered against him by the committee. The board concluded that Friedman's cross-appeal was moot, and adopted the committee's findings that Friedman had violated DR 1–102(A)(3), (4), and (5), DR 9–102(A), and DR 6–101(A)(3). The board agreed in part and disagreed in part with the committee's analysis and findings concerning aggravating and mitigating circumstances and recommended that Friedman be suspended from the practice of law for four years. It also recommended that Friedman be assessed bar counsel's costs and fees.

Friedman appeals.

## III. DISCUSSION

### A. Standard of Review

 " 'Bar counsel has the burden of proving the charges of misconduct in a petition for formal hearing by clear and convincing evidence. This court reviews the evidence adduced before the hearing committee independently while giving deference to the findings of the board.' "[3] A respondent attorney who challenges the board's findings of fact on appeal has the burden of showing that the findings are erroneous.[4] We ordinarily will not disturb findings of fact made upon conflicting evidence.[5]

 As to questions of law and questions concerning the appropriateness of sanctions, we exercise our independent judgment.[6] We determine sanctions on a case-by-case basis,[7] guided but not constrained by the American Bar Association's Standards for Imposing Lawyer Sanctions[8] and by the sanctions imposed in comparable disciplinary proceedings.[9]

 We perform a three-step analysis in imposing attorney sanctions.[10] We first address the first three prongs of the ABA Standards for imposing sanctions, determining the duty violated, the lawyer's mental state, and the extent of the actual or potential injury.[11] We next "look to the ABA Standards to discern what sanction is recommended for the 'type' of misconduct found in [step 1]."[12] Finally, after determining the recommended sanction, we decide whether aggravating or mitigating factors should affect that sanction.[13]

### B. Duty Violations Found by the Committee and the Board

#### 1. DR 1–102(A)(4) (dishonest conduct)

The hearing committee found that Friedman violated DR 1–102(A)(4) by misapplying funds held in trust.[14] The disciplinary board reviewed the record and adopted the committee's findings of fact.

The hearing committee found that Friedman stood in a fiduciary relationship to all the *UYAK II* claimants when he agreed to hold the settlement money in trust, pending an apportionment agreement and disbursement. It concluded that Friedman breached his fiduciary duty by paying fees to himself in May and December 1990, by advancing $10,000 to his client in the *UYAK II* matter in June 1990 before the *UYAK II* plaintiffs had agreed on an apportionment, and by advancing fees to himself in the five non-*UYAK II* matters before he had received the

---

3. *In re Triem*, 929 P.2d 634, 640 (Alaska 1996) (quoting *In re Frost*, 863 P.2d 843, 844 (Alaska 1993)).

4. *See id.*

5. *See id.*

6. *See In re Wiederholt*, 877 P.2d 765, 767 (Alaska 1994); *Frost*, 863 P.2d at 844–45.

7. *See In re Mann*, 853 P.2d 1115, 1116 (Alaska 1993).

8. American Bar Association, *Standards for Imposing Lawyer Sanctions* (1991) [hereinafter ABA Standards].

9. *See Frost*, 863 P.2d at 844–45, 854.

10. *See In re Buckalew*, 731 P.2d 48, 51–56 (Alaska 1986).

11. *See id.* at 52.

12. *Id.*

13. *See id.*

14. DR 1–102(A) provides in part: "A lawyer shall not: ... (4) [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

settlement funds in those matters. From its finding that Friedman "knowingly" wrote checks against the settlement proceeds before the express conditions of his trust allowed him to do so, the committee inferred that he intended the "natural and probable consequences of his ... knowing actions," i.e., the impairment and misapplication of the settlement funds and the corresponding breach of his fiduciary duties.

After Friedman testified at the sanction hearing, the committee's sanction recommendation stated that

> even though Friedman consciously intended to make advance payments to himself and to his clients from trust account funds, he did not consciously intend to deprive either his clients or the UYAK II co-plaintiffs of any funds to which they ultimately would be entitled. Rather, when Friedman made the advance payments, he believed these amounts had been "earned" even though no final apportionment had been agreed to in the UYAK II litigation and, in the five other cases, the settlement proceeds had not yet been received.

Friedman argues that there is no evidence of the intent necessary for a violation of DR 1–102(A)(4).[15] He claims that the intentional misconduct the rule requires cannot be inferred from a showing of a "knowing" mental state. "Knowing" includes the "conscious awareness of the nature or attendant circumstances of the conduct ... without the conscious objective or purpose to accomplish a particular result."[16] In contrast, intent in this context requires a "conscious objective or purpose to accomplish a particular result."[17]

■■ We agree with Friedman that finding "knowing" conduct is insufficient to support a violation of this rule. But "it is permissible to infer that an accused intends the natural and probable consequences of his or her knowing actions."[18] The hearing com-

mittee drew such an inference, finding intentional misconduct. We do not think it erred in doing so.

■ Friedman also asserts that the committee's finding of intentional misconduct on summary judgment conflicts with its later conclusion, reached after the sanction hearing, that Friedman "did not consciously intend to deprive either his clients or the UYAK II co-plaintiffs of any funds...." We think that the committee's statement in its sanction recommendation was consistent with its earlier finding that he had intentionally misapplied the trust funds. The committee's sanction recommendation simply found that Friedman did not intend to permanently deprive anyone of their share of the settlement proceeds. That finding does not preclude a finding of intentional misconduct in misapplying trust account funds.

Friedman implies that there was a procedural defect in finding the intent element upon summary judgment. Although we are unenthusiastic about a finding of intent on summary judgment, the procedure followed here probably cured any procedural deficiency: first, after hearing Friedman's extensive testimony at the sanction hearing, the hearing committee made additional findings and conclusions; second, the board independently considered the committee's proceedings, findings, and conclusions, as well as the record.

■ But in any event, we are the ultimate finder of fact in bar disciplinary matters,[19] and we read the record to establish that Friedman intended to draw on the trust account, that he knew that settlement funds had not been deposited, and that he knew that drawing on the account to pay himself fees before the settlement funds had been deposited would violate the disciplinary rules. Friedman's testimony demonstrates that he knew, when he signed the relevant checks, that it was improper to pay himself attor-

**15.** *See In re West*, 805 P.2d 351, 353–54 (Alaska 1991).

**16.** ABA Standards at 17. *See also Mann*, 853 P.2d at 1117–18.

**17.** *West*, 805 P.2d at 354 (quoting ABA Standards at 01:807 (1986)).

**18.** *Triem*, 929 P.2d at 648.

**19.** *See In re Frost*, 863 P.2d 843, 844 (Alaska 1993).

ney's fees in the five non-*UYAK II* matters before the settlement moneys in those matters had been placed in the account.[20] The hearing committee found that Friedman engaged in intentional misconduct and the evidence convinces us that in at least some of these matters, Friedman knew that the settlement checks had not yet been received. For example, in the *Bear, Hamilton,* and *Whitt* matters, Friedman paid his clients nothing until after he had received the settlement funds, even though he had advanced attorney's fees to himself weeks or months before receiving the settlement funds. He also testified that as soon as he settled a case, even if the settlement was only oral, he would tell his bookkeeper what the contingent fee arrangement was and that within a week or two he would sign a check drawn on his trust account for his fees. But receipt of a settlement check within two weeks of an oral agreement to settle would be unusual in a personal injury matter, and Friedman himself expressed his belief that insurance companies tended to delay payment, sometimes by as much as three months, because "they'll keep them as long as they can because they get the interest off the money rather than the client."

We therefore agree with the committee and the board and find independently that Friedman violated DR 1–102(A)(4).

### 2. DR 1–102(A)(5) (conduct prejudicial to administration of justice)

■ The hearing committee found that Friedman violated DR 1–102(A)(5) by advancing fees to himself before receiving the

---

**20.** The following exchanges make this clear:

Q: Can you tell us why you didn't ask if the money was in the trust account?

A: I—it just never occurred to me to ask. I always assumed that the money was there. I wouldn't have written a check if the money wasn't there.

Q: You assumed that the settlement money was in the account? Or you assume that. . . .

A: Yeah.

Q: . . . . general money in the account or other money in the account?

A: No. I assumed that the settlement money was in the account.

Inquiry on this subject continued:

Q: When you signed the checks that we've just been talking about, the. . . .

A: Bayer (ph), Geckle (ph). . . .

Q: Hamilton. . . .

A: Hamilton, Witt.

Q: . . . . Witt, et cetera checks. . . .

A: Mathias (ph). Right.

Q: . . . . did you know they were being drawn on your trust account?

A: Did I know that the checks were being drawn on the trust account?

Q: Yes.

A: Yes, I did.

Q: Okay. Did you know that you were paying yourself fees when the settlement proceeds had not yet arrived?

A: No, I did not. I never. . . .

Q: You test—I'm sorry?

A: I just—I just wouldn't have done that.

The inquiry returned to the subject:

Q: So you felt that the—if you felt that the companies were good for the money, in other words, that they would send a settlement check for X amount of dollars in the Bayer (ph) case, for example, and that that money would hit your trust account and be available for disbursements, can you tell us why your clients weren't cut a check at the same time that you were cut a check for your fees?

A: I don't think you've got my thinking down here. I mean, I—I—I hear what you're saying.

Q: Uh-huh [affirmative].

A: I guess, now—now I understand what you meant when you said, did you rely on the companies. I wasn't relying on companies when I cut—when these checks were drawn. I wasn't relying on anything when the checks were drawn because I wasn't cognizant that the check was drawn to that account, to that-to, you know, to that client, and that the check wasn't there. I just was not aware of that at the time. If I had been aware of that at the time, I wouldn't have cut the check or I wouldn't have had—I wouldn't—the check would not have been issued. I didn't need—I—I keep saying that and I'm sorry. I don't mean to give that as a response, but it—it—over and over, but I didn't need any money to go from the trust account to the general account at that time. That was not the usual—that was not the procedure that we wrote checks before the settlement check came in. That was not what we did. That was not what we were supposed to do in the office. That wasn't office policy.

. . . .

Q: And as an attorney . . . you were bound by Disciplinary Rule [9–102] on the proper handling of your trust account?

A: I don't know what the number of the rule is. I know—how—I know that I wasn't supposed to—I'm not supposed to do that. And I—I knew I wasn't supposed to do that, but I wasn't—I didn't know I was doing that it the time it was happening.

settlement funds in the five non-*UYAK II* matters and by advancing $10,000 to the Jaime estate and fees to himself in the *UYAK II* case before an apportionment agreement was reached.[21] The committee concluded that conduct occurring outside the courtroom but within the context of a settlement is encompassed by "the administration of justice" as that phrase is used in DR 1–102(A)(5).

Friedman argues that Alaska case law requires active interference with a civil or criminal proceeding for a violation of DR 1–102(A)(5). He contends that his alleged misconduct does not rise to this level. He notes that, unlike the conduct in cases cited by bar counsel and the committee in which lawyers fraudulently notarized a client's signature[22] or wrote offensive letters to the state,[23] his acts did not prejudice the administration of justice. He asserts that attorneys routinely release such funds to their clients. Friedman claims that there is no evidence that his alleged conduct interfered with or impeded the administration of any case or proceeding. He alleges that bar counsel's "bald assertion" that "[t]here is little that is more reprehensible and prejudicial to the interests of justice than a lawyer mishandling funds entrusted to him[,]" is insufficient to support summary judgment.

Bar counsel's unenthusiastic defense of the committee's finding asks us to conclude that invading funds earmarked for settlement in a pending case interferes with the administration of justice. Bar counsel also concedes that a reversal of the committee's finding on this issue would not undermine the disciplinary board's ultimate recommendation for discipline because that recommendation did not rest on this finding.

Most of our cases discussing this rule involved conduct that actively interfered with civil or criminal proceedings. For example, in *In re West*,[24] the attorney's conduct induced the state to enter into a settlement which otherwise would have been lost or delayed.[25] We there cited other examples:

> This court has found DR 1–102(A)(5) violations where an attorney fabricated a deed and attached it to an amended complaint, [*In re*] *Walton*, 676 P.2d [1078,] 1081–88 [(Alaska 1983)]; where an attorney submitted an inaccurate interrogatory response, [*In re*] *Simpson*, 645 P.2d [1223,] 1228 [(Alaska 1982)]; and, where an attorney signed an affidavit, which was filed with the court, stating that a note was prepared and sent on a certain date when the note was actually prepared five years later, [*In re*] *Stump*, 621 P.2d [263,] 267 [(Alaska 1980)].[26]

These cases involved affirmative acts intended to mislead others in the course of judicial proceedings for the benefit of the attorney or the attorney's client. Thus, in *In re Vollintine*,[27] we found a DR 1–102(A)(5) violation where an attorney wrote a deliberately harassing letter to federal officials, accusing them of incompetence, perjury, fraud, cheating, and criminal liability, to influence coercively a matter impacting the attorney's client.[28]

The cases suggest that DR 1–102(A)(5) contemplates conduct which impedes or subverts the process of resolving disputes; it is conduct which frustrates the fair balance of interests or "justice" essential to litigation or other proceedings. Cases elsewhere are in accord with this reading of the rule.[29]

Friedman's conduct affected or potentially affected his clients and the other plaintiffs.

---

21. DR 1–102(A) states in part: "A lawyer shall not . . . (5)[e]ngage in conduct that is prejudicial to the administration of justice."

22. *See West*, 805 P.2d at 352–53.

23. *See In re Vollintine*, 673 P.2d 755, 756–58 (Alaska 1983).

24. 805 P.2d 351 (Alaska 1991).

25. *See id.* at 352–53.

26. *Id.* at 354 n. 7.

27. 673 P.2d 755 (Alaska 1983).

28. *See id.* at 756–58.

29. *See e.g., Tedesco v. Mishkin*, 629 F.Supp. 1474, 1483 (S.D.N.Y.1986) (unauthorized, misleading, and inherently coercive communications to class action members that frustrated court's purpose); *In re Riley*, 142 Ariz. 604, 691 P.2d 695, 700–01 (1984) (improper ex parte comments to judge).

But it did not adversely affect litigation proceedings or a process fundamental to the administration of justice. It therefore did not prejudice the "administration of justice," as that phrase is used in DR 1–102(A)(5), and consequently did not violate this rule.

### 3. DR 9–102(A) (handling of client funds)

 The hearing committee found that Friedman violated DR 9–102(A).[30] It concluded that Friedman could not collect his fees for his work in *UYAK II* and that he could not advance settlement proceeds to his client until all *UYAK II* plaintiffs had agreed to an apportionment of the settlement proceeds. It also concluded that Friedman could not collect his fees for his work in the non-*UYAK II* matters before receiving and depositing the settlement checks in those matters.

Friedman argues that summary judgment was inappropriate because his affidavit denied that settlement funds were withdrawn before he earned them.[31] Bar counsel responds that it is irrelevant whether Friedman had "earned" the funds when he withdrew them and that the relevant inquiry is whether the funds were "due" when they were withdrawn. Bar counsel notes that the findings of the hearing committee and the disciplinary board that Friedman withdrew the funds before they were "due" established the violation.

 Attorney's fees are not "due" in a matter until the settlement funds in that matter have been deposited. As a matter of policy, the lawyer, not the client, should bear the risk of non-payment in this situation. Friedman presents no evidence to contradict the bar's evidence that in six matters (including *UYAK II* ), Friedman paid himself a fee before the settlement funds were deposited. Friedman's affidavit at most raises a genuine dispute about whether he had *earned* the fees he withdrew; but that dispute is not material, and it is undisputed that the settlement proceeds from which the fees were to be paid had not been fully received. We therefore conclude that Friedman violated DR 9–102(A).

### 4. DR 1–102(A)(3) (illegal conduct involving moral turpitude)

 Finally, the hearing committee found that Friedman violated DR 1–102(A)(3),[32] because it found that his behavior constituted the crime of misapplication of property under AS 11.46.620(a).[33] Misapplication of property is committed "if the person knowingly misapplies property that has been entrusted to that person as a fiduciary."[34] Misapplication of property worth $500 or more is a class C felony.[35]

---

**30.** DR 9–102(A) states:

All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable insured depository accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) Funds reasonably sufficient to pay services charges may be deposited therein.

(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

For purposes of this rule, "insured depository accounts" shall mean government insured accounts at a regulated financial institution on which withdrawals or transfers can be made on demand, subject only to any notice period which the institution is required to reserve by law or regulation.

**31.** Friedman also argues that the name of the account in which he deposited the funds did not violate DR 9–102(A). But bar counsel notes that it dismissed this charge and that the disciplinary board did not base its sanction decision upon it. Therefore, it is not an issue on appeal.

**32.** DR 1–102(A) states in part: "A lawyer shall not ... (3) [e]ngage in illegal conduct involving moral turpitude."

**33.** Because Friedman's conduct actually took place in California, this is equivalent to a finding that if his conduct had taken place in Alaska, it would have violated the statute.

**34.** AS 11.46.620(a).

**35.** *See* AS 11.46.620(d)(1).

Friedman argues that it was not appropriate to decide on summary judgment whether he violated DR 1–102(A)(3). The crime of misapplication of property requires a "knowing" mental state; an individual's mental state, he argues, cannot be determined on summary judgment. Friedman also contends that there was insufficient evidence to sustain a summary judgment; Friedman affied that he did not know or believe that he was breaching any fiduciary duties owed to his clients or to the *UYAK II* co-plaintiffs. Bar counsel points out that the hearing committee twice found that Friedman knew he was impairing the trust account and thus that he had committed the crime of misapplication of property; bar counsel urges us to make the same finding.

■■■ Misapplication of property is an exception to the general rule that ignorance of the law is no excuse. Alaska Statute 11.46.620 requires that a defendant, to be guilty of misapplying property, must both act knowingly and know that the act is unlawful.[36] Thus, to find that Friedman violated the statute requires finding not only that he knowingly engaged in conduct that violated fiduciary rules but also that he acted with subjective awareness of the wrongdoing—that he actually knew that his acts violated those rules.[37]

In *In re Mann*, we held that an attorney who misapplied trust funds violated DR 1–102(A)(3).[38] Mann acted in knowing violation of the law when he diverted client funds to make mortgage payments on his house and was convicted of misapplication of property; he spent sixty days in jail.[39]

Friedman acknowledged that he prematurely withdrew money from his trust account, but argues on appeal that he did not understand that the rules governing fiduciary responsibility prohibited his conduct. He refers us to his testimony at the sanction hearing and to his affidavit.

But our review of his testimony convinces us that he understood that it would be wrong to write checks to himself for fees before depositing the settlement funds.[40] And, because we conclude that he knew that the settlement funds for at least some matters had not yet been deposited or even received when he paid himself fees from the trust account, we agree with the committee and the board that Friedman violated DR 1–102(A)(3).[41]

### C. *Mental State*

■■■ We next consider the second prong, Friedman's mental state. The hearing committee found, and the disciplinary board agreed, that Friedman "consciously intended to make advance payments" from trust account funds. But the committee also found, based on evidence presented at the sanction hearing, that "he did not consciously intend to deprive either his clients or the UYAK II co-plaintiffs of any funds to which they ultimately would be entitled." The committee thus distinguished between Friedman's state of mind concerning the act of withdrawing the money and his state of mind about how withdrawals might affect clients and others to whom he owed a fiduciary duty. The disciplinary board did not expressly address this finding.

36. *See Moore v. State,* 740 P.2d 472 (Alaska App. 1987). Bar counsel cites *Moore* for the proposition that misapplication by a fiduciary does not require intent to permanently deprive the owner. But this argument fails to recognize that under *Moore,* misapplication requires knowledge of the law itself.

37. This inquiry into mental state for the purposes of misapplication of property differs from the inquiry into Friedman's mental state regarding his fiduciary violations. Fiduciary violations do not require subjective awareness of wrongdoing.

38. *See* 853 P.2d 1115, 1116–17 (Alaska 1993).

39. *See id.* at 1116.

40. *See supra* note 20.

41. The hearing committee also found that Friedman violated DR 6–101(A)(3) by neglecting a legal matter entrusted to him. We find it unnecessary here to decide whether this section applies to intentional mishandling of client funds. Assuming it does apply, intentionally mishandling trust funds in a legal matter—the conduct giving rise to a violation—would also be a violation of DR 1–102(A)(4). Finding a violation of DR 6–101(A)(3) would have no bearing on the sanction and therefore has no independent significance.

We agree that Friedman intentionally disbursed the funds knowing that he was doing so prematurely. He thus intentionally violated the trust under which the *UYAK II* partial payment had been received as well as the terms under which the funds were entrusted to him for deposit in his trust account. Evidence supports the committee's finding that he did not intend to deprive his clients or others of monies which would be due them. As it turned out, his misconduct did not actually deprive them of trust funds. But because the account was out of trust, the *UYAK II* co-plaintiffs and his own clients were unwittingly dependent on Friedman's personal resources. Subsequent audit revealed that those resources would have been sufficient to satisfy all such claims, suggesting that his intention was not to permanently deprive clients or the co-plaintiffs of anything they were to be paid. But this does not alter our conclusion that he consciously intended to make advance payments that he knew were premature.

### D. *Injury*

■ We turn to the third prong, the extent of potential or actual injury. The parties agree that no client of Friedman's suffered actual injury. The potential for financial injury, as it fortuitously turns out, was minimal, because Friedman had sufficient personal funds to cover any demand for money any client or *UYAK II* party might have made.

But bar counsel argued, and the hearing committee agreed, that Friedman caused actual injury to the public, because "the public suffers injury whenever a lawyer fails to maintain personal integrity by improperly handling funds held in trust." We agree with that analysis.

### E. *Initial Determination of Appropriate Sanction*

We now consider the discipline called for under the ABA Standards, absent aggravating or mitigating circumstances.

As to the violations of duties Friedman owed clients, the hearing committee reasoned that suspension was the most applicable sanction under ABA Standards § 4.1, because the committee was not persuaded that Friedman knowingly converted client funds. As to violations of duties he owed the public, including the *UYAK II* claimants, the committee noted that Friedman appeared to have violated AS 11.46.620, and concluded that either suspension under ABA Standards § 5.12 or disbarment under ABA Standards § 5.11(a) was appropriate. The disciplinary board concluded that three of the applicable standards— §§ 4.11, 4.42(c), and 5.11(a)— called for disbarment, absent aggravating or mitigating circumstances.

Different standards potentially apply to each of Friedman's violations. Considered together, the standards suggest that disbarment is appropriate, absent mitigating factors.

Friedman violated DR 1–102(A)(4) by intentionally engaging in misconduct that involved "dishonesty, fraud, deceit, or misrepresentation." [42] ABA Standards § 5.11(b) applies to such conduct. [43] It states that disbarment is generally appropriate in such cases. [44]

Friedman violated DR 9–102(A) when he drew on the trust account to pay himself fees before they were due. [45] Bar counsel urges us to apply ABA Standards § 4.11, which generally calls for disbarment, to this misconduct. [46] ABA Standards § 4.12, which recommends suspension "when a lawyer knows or should know that he is dealing improperly with client property and causes

---

**42.** *See supra* Part III.B.1.

**43.** ABA Standards § 5.11 provides in relevant part:
Disbarment is generally appropriate when:
. . . .
(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

**44.** *See id.*

**45.** *See supra* Part III.B.3.

**46.** ABA Standards § 4.11 states: "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client."

injury or potential injury to a client," [47] also potentially applies. Given Friedman's conscious intention to use trust funds to pay himself fees before they were due, we agree with bar counsel's assertion that Friedman temporarily " 'diverted' *UYAK II* settlement funds to his own use." We note, as did the hearing committee, that disbarment should be reserved for cases in which the lawyer uses the client's funds for the lawyer's own benefit.[48] But that is precisely what Friedman did here. That no individual harm resulted does not change the nature of his act. On the other hand, it appears he did not intend to permanently deprive anyone of trust proceeds. Either sanction therefore could apply to this violation.

ABA Standards § 5.11(a), calling for disbarment, also applies because Friedman engaged in "serious criminal conduct, a necessary element of which includes ... misappropriation." Friedman's conduct, if committed in Alaska, would have violated AS 11.46.620(a) and would have been a class C felony.[49]

### F. *Aggravating and Mitigating Circumstances*

██ "[A]fter making the initial determination as to the appropriate sanction, the court [should] then consider any relevant aggravating or mitigating factors." [50] Because disbarment is the most severe sanction we can impose, aggravating factors are relevant only to the extent that they neutralize the mitigating factors.[51]

The ABA Standards recognize ten aggravating factors.[52] The disciplinary board found four aggravators here: a pattern of misconduct, submission of false statements, illegal conduct, and a dishonest or selfish motive. The board thus differed from the hearing committee, which had found no dishonest or selfish motive.

██ Friedman disputes the existence of a selfish motive. The board based its finding on the fact that Friedman "used the withdrawn mon[ies] for his own purposes." Friedman contends that this finding is inconsistent with the weight of the evidence. In support, he points out that the hearing committee found that he did not intend to deprive clients of any money and withdrew funds only when he believed he had earned them.

██ We independently review the evidence while giving great weight to the board's factual findings.[53] Friedman relies on the testimony of Jeffrey Martin, a Certified Public Accountant audit specialist. Martin opined that Friedman's handling of the trust accounts never placed a client at risk and that there was no evidence of fraud. Friedman also relies on his own testimony that he did not withdraw settlement monies as fees until he believed he had earned them.

But our review of the evidence discussed above convinces us that Friedman knew he was drawing on trust funds to pay himself fees before they were due. This use of the funds was dishonest and for his selfish motive. Lack of an intention to deprive clients or others of monies that were to be paid to them later does not establish that his intervening use of these monies was honest or

---

**47.** ABA Standards § 4.12.

**48.** *See* ABA Standards § 4.12 commentary.

**49.** *See* AS 11.46.620(c), (d)(1).

**50.** ABA Standards at 5.

**51.** *See In re Mann*, 853 P.2d 1115, 1118 (Alaska 1993).

**52.** ABA Standards § 9.22 states:

*Factors which may be considered in aggravation.* Aggravating factors include:
(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution.

**53.** *See In re Triem*, 929 P.2d 634, 640 (Alaska 1996).

unselfishly motivated. Our conclusion here is consistent with our holding above regarding Friedman's state of mind.[54] We therefore agree with the board that this aggravator applies here.

■ The board did not err in applying the "illegal conduct" aggravator. The committee applied this aggravator based on its finding that Friedman committed misapplication of property. Because we concluded in Part III.B.4 that Friedman had the mental state necessary to be guilty of misapplication of property, this aggravator applies.

■ We also find no clear error in the board's finding that two other aggravators applied. The finding of a "pattern of misconduct" is supported by evidence that the conduct extended over the course of a year and involved at least six clients and tens of thousands of dollars. The finding of "submission of false statements" is supported by evidence of Friedman's letters to bar counsel stating that the $81,000 had been deposited in his client trust account and had not been used for anything. Friedman claims that he did not know that these statements were false at the time he made them; but he made no attempt to check his records to verify his own statement.

ABA Standards § 9.32 specifies possible mitigating factors.[55] The board found four mitigators: absence of a prior disciplinary record; good character or reputation; delay in disciplinary proceedings (the period between June 1994, when bar counsel ended the investigation, and December 1995, when bar counsel filed the petition); and remorse. The board rejected three additional mitigators recommended by the hearing committee: personal or emotional problems; a physical disability; and the absence of a dishonest or selfish motive.

On appeal, neither party challenges the board's discussion of mitigators. The record supports that discussion.

■ Friedman argues that a weighing of the aggravating and mitigating factors, in light of our prior cases, does not support the board's recommendation of a four-year suspension. As we have noted previously, there is no "magic formula" for determining how aggravating and mitigating circumstances affect an otherwise appropriate sanction.[56] "Each case presents different circumstances which must be weighed against the nature and gravity of the lawyer's misconduct."[57]

Our past cases circumscribe our analysis here. The disciplinary board paid "particular attention" to *In re Mann*. Mann was suspended for three years after confessing to appropriating client funds in order to make past-due mortgage payments on his home.[58] Mann turned himself in to police and was ultimately convicted of a class C felony.[59] His voluntary disclosure mitigated the sanction of disbarment.[60]

At the other end of the spectrum are *In re West*[61] and *In re Triem*.[62] West intentionally notarized his deceased client's signature, knowing that the client's widow had falsified

---

54. *See supra* Part III.C.

55. ABA Standards § 9.32 states:
 *Factors which may be considered in mitigation.* Mitigating factors include:
 (a) absence of a prior disciplinary record;
 (b) absence of a dishonest or selfish motive;
 (c) personal or emotional problems;
 (d) timely good faith effort to make restitution or to rectify consequences of misconduct;
 (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
 (f) inexperience in the practice of law;
 (g) character or reputation;
 (h) physical or mental disability or impairment;
 (i) delay in disciplinary proceedings;
 (j) interim rehabilitation;

(k) imposition of other penalties or sanctions;
(*l*) remorse;
(m) remoteness of prior offenses.

56. *In re Buckalew,* 731 P.2d 48, 54 (Alaska 1986).

57. *Id.*

58. *See Mann,* 853 P.2d at 1116.

59. *See id.*

60. *See id.* at 1119.

61. 805 P.2d 351 (Alaska 1991).

62. 929 P.2d 634 (Alaska 1996).

the signature at West's direction.[63] The attorney's motive was to induce the state to enter into a negotiated property-loss settlement which would have at least temporarily foundered if the client's fatal heart attack had been revealed.[64] We found that West clearly intended the consequences of his actions, and we made the observations quoted above in Part III.B.2.[65] West received a ninety-day suspension.[66]

In *Triem*, the lawyer was publicly censured.[67] He violated DR 1–102(A)(4) when he told his opponent that discovery materials had been placed in the mail, but then retrieved them from the mail without telling opposing counsel.[68] He thus deceived counsel into believing that discovery materials had been produced.[69] The court concluded that a harsher sanction was unnecessary because Triem did not submit the false documents to the court and had already been penalized by the court for his misrepresentation.[70]

■ We think that the nature of Friedman's misconduct was similar to Mann's and much worse than West's and Triem's. Mann was suspended for three years. Given this precedent and the mitigating factors, we believe the appropriate sanction is suspension for three years. Mann's conduct differs from Friedman's in two main respects. He took much less money than Friedman. And he self-reported, whereas Friedman denied withdrawing the money. We find that the former distinction is not as great as it might seem. Mann took what he needed, as did Friedman. As to the second distinction,

Friedman's denial is certainly an aggravator. However, based on our independent evaluation of the record, the following circumstances convince us that a three-year suspension, like Mann's, is appropriate and that a four-year suspension would be too harsh: (1) Friedman's lack of a prior disciplinary record; (2) the absence of loss or injury to his clients; (3) his undisputed dedication to his clients and outstanding commitment to pro bono and public service; and (4) the significant measures that Friedman took to remedy the problems caused by his conduct.

Friedman relies on a variety of other circumstances to support his argument that no sanction greater than a six-month suspension is appropriate. He notes the committee's findings that his clients and all *UYAK II* parties received what they were entitled to without delay attributable to Friedman. He also correctly notes that the fees he paid himself corresponded to the fees he would be entitled to charge. His assertion that no client has ever filed a grievance against him is not disputed by bar counsel. He also notes the unusual circumstances of his legal education [71] and the undisputed evidence establishing his public service and the quality of his work for his clients.[72] He notes disabling circumstances.[73]

We have considered these circumstances. They do not convince us that the sanction he proposes is sufficient.

## IV. CONCLUSION

For these reasons, we find that Friedman violated DR 1–102(A)(4), DR 9–102(A), and

63. *See West*, 805 P.2d at 352–53.

64. *See id.*

65. *See id.* at 354.

66. *See id.* at 360.

67. *See* 929 P.2d at 649.

68. *See id.* at 637.

69. *See id.* at 648–49.

70. *See id.*

71. He never attended college, was admitted to law school at Golden Gate University at age thirty-five on the recommendation of several

Alaska lawyers, and graduated from the University of California, Boalt Hall.

72. Admitted in California and Alaska, he has maintained a solo practice in the San Francisco Bay Area. Testimony of numerous character witnesses justified a conclusion that Friedman has a deep commitment to helping people in need, possibly causing him to hire unqualified personnel for his law office and to maintain a very large caseload.

Friedman had little aptitude for the business side of practice. He never had a bank account before he went to law school.

73. Friedman was suffering emotionally and physically from a divorce and a back injury.

DR 1–102(A)(3), and therefore impose the sanction of a three-year suspension from the practice of law.[74]

MATTHEWS, Chief Justice, dissents as to sanctions.

BRYNER, Justice, dissenting.

MATTHEWS, Chief Justice, dissenting as to sanctions.

I agree with the opinion of the court that Friedman knowingly and intentionally misapplied trust funds and that in so doing he engaged in serious criminal conduct. But for the reasons that follow, I would impose a period of suspension of four years.

The ABA Standards generally call for disbarment in a case like this.[1] But these standards are only guidelines and in deciding the question of what sanction was appropriate the disciplinary board paid particular attention to this court's case of *In re Mann*.[2] In *Mann* a majority of this court imposed a three-year suspension on a defalcating lawyer. The board in the present case found that Friedman's conduct was "overall, more reprehensible than ... Mann's," and so imposed a four-year period of suspension.

I agree with the board that Friedman's conduct is worse than Mann's in several respects. Friedman converted more client funds, as much as $72,000 at one point, whereas Mann's conversion was only a little more than $2,000.[3] . The duration of Friedman's misappropriation lasted more than a year, whereas the duration of Mann's conversion was less than a month.[4] Mann reported his breach voluntarily soon after it occurred and fully cooperated with the bar.[5] Friedman, by contrast, never reported his breaches and did not tell the truth concerning them.

Considering *Mann* as the most directly applicable precedent, I would accept the disciplinary board's recommendation and suspend Friedman for four years.

BRYNER, Justice, dissents.

## I. *INTRODUCTION*

I disagree with the court's use of its independent fact-finding power to conclude that Friedman acted dishonestly[1] and engaged in criminal misconduct[2] by intentionally misapplying settlement funds. The disciplinary board's recommendation of a four-year suspension leaned heavily on the hearing committee's finding that Friedman's conduct amounted to misapplication of property—a finding that the court affirms independently. If I thought that the committee had made this finding properly or that the board had properly approved it, I might be inclined to agree with Justice Matthews that Friedman's sanction should be governed by *In re Mann*.[3] But the bar's finding of criminal misconduct reflects a fundamental misunderstanding of applicable law. And in my view the court compounds this error—and compromises its own precedent—by attempting to use its power of independent review as a cure for the bar's failure to accord Friedman due process.

## II. *THE BAR'S DISCIPLINARY FINDINGS ARE LEGALLY FLAWED.*

### A. *Referring to Friedman's Conduct as Intentional Is Ambiguous* .

The hearing committee, the disciplinary board, and the court have called Friedman's conduct "intentional" without specifying what they mean. But in ordinary usage, saying that someone acted intentionally can mean different things. As applied to Friedman's

---

74. We also accept the recommendation of the disciplinary board that Friedman be assessed $3,213 in costs and attorney's fees incurred by bar counsel in proceedings before the hearing committee and the board.

1. *See* ABA Standards § 4.11 and § 5.11, set out in the opinion of the court at 631, footnotes 43 and 46.

2. 853 P.2d 1115 (Alaska 1993).

3. *See id.* at 1116.

4. *See id.*

5. *See id.*

1. DR 1–102(A)(4) (dishonest conduct).

2. DR 1–102(A)(3) (illegal conduct involving moral turpitude).

3. 853 P.2d 1115 (Alaska 1993).

conduct, "intentional" could have several meanings. It will help at the outset to clarify this ambiguity.

Friedman might be said to have acted intentionally (1) if he knowingly signed trust account checks without making a reasonable effort to determine what funds would actually pay them; (2) if he knowingly signed trust account checks to be paid out of specific settlement funds without making a reasonable effort to determine if the settlement was final and fully paid; (3) if he signed trust account checks out of settlement funds that he knew were not yet fully paid but mistakenly thought that such premature payments were proper; or (4) if he signed trust account checks that he actually knew to be premature, knowing that this conduct was improper.

The first and fourth of these meanings deserve special attention here. The first—that Friedman acted intentionally by voluntarily signing checks that turned out to be premature—is significant because the disciplinary committee adopted this meaning in finding that Friedman had committed intentional misconduct. The fourth—that Friedman acted intentionally because he knew that he was writing premature checks and knew that his conduct was improper—is vital because it is the only form of intent that qualifies as criminal misapplication of property. Alaska law uses this narrow meaning to define the essential elements of the crime: under the Alaska Criminal Code's definition, a person who commits misapplication of property must knowingly engage in conduct that is listed within the statutory definition of "misapply" with actual knowledge that this conduct is improper.[4]

**B.** *The Hearing Committee Improperly Applied a Conclusive Presumption of Intentional Conduct.*

I agree with Justice Matthews's partial dissent that if Friedman wrote checks from his trust account knowing that he was wrongfully "borrowing" money from client or settlement funds, he would deserve a severe sanction: this conduct would indeed amount to a misapplication of property, would make Friedman's case at least as serious as *In re Mann*, and would therefore presumptively warrant disbarment under section 4.11 of the ABA Standards. But this is not what the hearing committee and disciplinary board found that Friedman actually did.

Friedman unequivocally testified that he knew it would be improper to make advance payments to himself—or "borrow"—from trust funds; he insisted that he never would have done so knowingly. On two separate occasions in his pre-hearing correspondence with the bar, he expressly represented that the entire $81,000 Cal–Alaska payment on the *Uyak II* settlement actually remained untouched in his trust account until after the case was completely settled. The bar later proved these statements to be untrue. But Friedman nevertheless insisted that he believed them to be true when he made them.

At the sanctions hearing before the hearing committee, Friedman portrayed himself as a disorganized and unsophisticated solo practitioner who lacked business experience; during the period at issue, he was beset by a variety of problems-a nagging back injury, a disintegrating marriage, and a burgeoning caseload. Given these circumstances, Friedman claimed, he naively trusted his staff—an inexperienced secretary and a part-time bookkeeper—to know what checks to write and when to write them. According to Friedman, he usually told his staff that a case had settled, the amount of the settlement, and the basic fee agreement. But he ordinarily gave them no further direction, paying little attention to what checks they prepared for his signature. From time to time they left piles of checks on his desk for

---

**4.** Specifically, AS 11.46.620(a) provides: "A person commits the crime of misapplication of property if the person knowingly misapplies property that has been entrusted to that person as a fiduciary or that is property of the government or a financial institution." Subsection (c) of the statute defines "misapply" as meaning "to deal with or dispose of property contrary to (1) law; (2) a judicial rule or order; or (3) the obligations of a fiduciary relationship." When read together, these provisions require that, to be guilty of misapplying property, a person must engage in knowing conduct *and* must also know that the conduct is contrary to law, a judicial rule or order, or a fiduciary duty. *See Moore v. State*, 740 P.2d 472, 475 (Alaska App.1987).

his signature, and he would just sign them. As Friedman's counsel put it in arguing the point to the disciplinary board: "[Y]ou asked why did he, quote, take the money. He didn't take the money. He signed checks. And the short answer is because it was sloppy." The essence of Friedman's claim, then, was that he never actually understood what he was doing.

If this claim is true (and the committee's sanctions findings suggest that it is), it would preclude a finding that Friedman acted intentionally in the sense required to prove criminal misapplication of property. But the hearing committee never determined Friedman's actual intent. Before the committee conducted its hearing on the merits of the disciplinary petition, the bar moved for summary judgment. In advancing this motion, the bar relied on Friedman's early correspondence claiming that the entire $81,000 *Uyak II* settlement payment remained in his trust account until after the case was completely settled. The bar had subsequently obtained, and filed with the committee, bank records establishing that Friedman's claim was untrue—that Friedman had in fact drawn down the *Uyak II* settlement funds prior to final settlement. Because Friedman did not dispute these records showing premature payments, the bar asserted that the undisputed evidence before the committee conclusively established that Friedman had made trust account payments to himself prematurely. The bar bridged the gap from conduct to intent by invoking a legal presumption. The bar contended that Friedman's guilt of intentional misconduct was conclusively established by the undisputed evidence that he had written premature trust account checks.

This contention prevailed. Despite substantial evidence indicating that Friedman

did not actually know that his trust account payments were premature, and even though Friedman had not yet been able to mount his full defense, the hearing committee granted the bar's motion for summary judgment. Noting that Friedman had knowingly written trust account checks that were in fact premature, the hearing committee relied on *In re West*[5] and *In re Triem*[6] to conclusively presume that he acted intentionally:

> [T]he impairment and misapplication of settlement funds and the corresponding breach of Friedman's fiduciary duties were "the natural and probable consequences of his ... knowing actions" in writing checks against the *Uyak II* settlement proceeds before the express conditions of his trust allowed him to do so. Friedman's misapplication of trust funds was therefore intentional as defined by the Alaska Supreme Court in *West* and *Triem*.

But the committee's reasoning is legally flawed. *West* and *Triem* speak of a permissive inference, not a conclusive presumption: the rule they describe permits a fact-finder to infer intent from knowing conduct, but does not require it.[7] Indeed, in cases involving proof of criminal conduct, a rule that requires intent to be presumed from the natural consequences of the accused's conduct has been denounced as flatly unconstitutional.[8] The law recognizes that intent is an issue of fact and so, like other facts, must be determined by the totality of the circumstances in each case. Hence, for purposes of deciding the bar's summary judgment motion, the committee was required to view the evidence in the light most favorable to Friedman and to draw all inferences in his favor.[9] Here, even if Friedman's intent to write premature checks might be inferred from his acts of writing checks that he should have known would be premature, he nonetheless

5. 805 P.2d 351 (Alaska 1991).

6. 929 P.2d 634 (Alaska 1996).

7. *Cf.* Alaska R.Evid. 303(a); *see generally Marrone v. State*, 653 P.2d 672, 676–79 (Alaska App. 1982).

8. *See, e.g., Walker v. State*, 652 P.2d 88, 91 (Alaska 1982) (quoting *Sandstrom v. Montana*, 442 U.S. 510, 523–24, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979))("[A] jury instruction providing that 'the

law presumes that a person intends the ordinary consequences of his voluntary acts' violates a defendant's right to due process, because it constitutes either a burden-shifting presumption or a conclusive presumption on the element of intent.' ").

9. *See Wilson v. Pollet*, 416 P.2d 381, 383 (Alaska 1966).

disputed this inference, maintaining that he did not actually know. In ruling on summary judgment, the committee was obliged to draw the inference in Friedman's favor.

The committee's treatment of "knowledge" as an undisputed point and of "intent" as a conclusively presumed matter thus blurred the critical question raised by Friedman's defense: whether Friedman actually intended the natural and probable consequences of his conduct, that is, whether he actually knew that the trust account checks were premature or merely knew that he was writing trust account checks and should have known that the checks were premature.

At first blush, one might read the hearing committee's findings to mean that Friedman actually knew that he was "borrowing" client funds: the summary judgment decision stated that "Friedman's actions in writing checks against his settlement funds that had not yet been received, thus 'borrowing' against the $81,000 that he held in trust . . . , were 'knowing.'" Yet two factors preclude interpreting this language as a finding that Friedman actually knew that he was writing premature checks, or "borrowing" his client's funds.

First, because it was ruling on a summary judgment motion, the committee ostensibly based this finding on the undisputed evidentiary record then before it. In so doing, it relied on Friedman's affidavit. Yet when the affidavit is read in the light most favorable to Friedman, as the committee presumably read it, it hardly concedes knowledge of prematurity; rather, it only acknowledges that Friedman knowingly signed trust account checks that he should have recognized would be premature and that did turn out to be premature. Indeed, had Friedman conceded knowing that his payments were premature he would have abandoned his core defense—that he never knew what checks he was signing. To read the summary judgment decision as saying that Friedman actually knew his checks were premature, then, we would have to conclude that the committee misapplied the basic rules of summary judgment and construed his affidavit as a total surrender.

Second, the committee's later sanctions hearing findings affirmatively establish its belief that Friedman signed the checks without actually knowing that they were premature. At the end of the sanctions hearing, the bar challenged as implausible Friedman's claim that he had written the trust account checks without knowing that the payments were premature. In advancing this argument, the bar accused Friedman of lying when he falsely informed the bar that Cal-Alaska's entire $81,000 *Uyak II* payment "remained in my attorney-client trust account until August of 1991." Yet the committee rejected the bar's argument on this point; refusing to find that Friedman had lied, it expressly determined that he had only been negligent:

> Friedman made several significant false statements in correspondence to Bar counsel during the disciplinary process. Although *we do not find that these misrepresentations were knowing or intentional,* we believe that Friedman, upon reasonable investigation, *should have known* that the statements were false at the time they were made.

(Emphasis added.)

It would have been self-contradictory for the committee to make this finding at the sanctions stage if it had already found, in its summary judgment ruling, that Friedman actually knew that the checks were premature when he signed them. Had that been the case, Friedman certainly would have known when he corresponded with the bar that his statements concerning the *Uyak II* trust funds were false. Yet the committee's sanctions decision found only that Friedman "should have known." Similarly, had the committee earlier found that Friedman signed checks that he actually knew were premature, it would have been senseless for the committee to suggest in its sanctions decision that the bar's inquiry concerning the trust account payments should have prompted Friedman to undertake a "reasonable investigation" before responding: he already would have known. The sanctions decision, then, confirms that after hearing Friedman's defense at the sanctions hearing, the committee believed that he did not actually know that he had written premature checks—that he "just wouldn't have done that."

Yet despite its obvious acceptance of Friedman's defense, the hearing committee never revisited or questioned the legal underpinnings of its prior summary judgment decision. The only logical explanation for this is that the committee still felt constrained by its mistaken understanding of *Triem* and *West*—cases that it continued to view as establishing a mandatory presumption of intentional conduct.

The committee's continued reliance on this mandatory presumption also suggests a plausible explanation for both its lenient sanctions recommendation and its effort to rest that recommendation on a strained distinction between the wrongfulness of "borrowing" and permanently converting client funds. Believing itself bound as a matter of law to presume that Friedman had acted with an intent that the committee believed he had not actually had, the committee may well have been strongly motivated to ameliorate his situation by attempting to draw technical distinctions—no matter how implausible—between these two forms of criminal intent. Although the disciplinary board and the court have rightly condemned these distinctions as legally untenable, the committee's reliance on them is nonetheless telling, for it betrays the committee's discomfort with the notion that the law conclusively deemed Friedman's conduct "intentional," even though he did not actually know that his checks were premature.

If the committee had realized that it was not bound by a mandatory presumption—that it was free to determine Friedman's actual intent as it would determine any other ordinary factual matter—it no doubt would have found that his conduct amounted to negligent—or perhaps even reckless—professional misconduct. I certainly do not suggest otherwise. But the foregoing circumstances also establish that the committee would not have found that he actually intended to "borrow" client funds. For it makes no sense to suppose that the committee would find in one breath that Friedman knew he was writing trust checks prematurely, yet would conclude in the next that he deserved a break because he only wanted to "borrow" his client's money. That conclusion would have flown in the face of Friedman's own statements insisting that he knew that "borrowing" trust funds was wrong and never would have done it. Hence, if the committee believed that Friedman actually intended to write premature checks, it would have had to conclude that he lied in his pre-hearing correspondence and perjured himself at the sanctions hearing.

In summary, then, the only plausible explanation for the hearing committee's recommendation of leniency and for its unequivocal finding that Friedman's pre-hearing correspondence did not intentionally misrepresent the condition of his trust accounts is that the committee did not believe that Friedman actually knew he was "borrowing" client funds when he wrote the disputed checks; it legally presumed that he knew. Given the committee's mistaken reliance on this conclusive presumption, its finding of intentional misconduct is factually and legally flawed.

### C. The Disciplinary Board's Recommendation Incorporates the Hearing Committee's Erroneous Finding of Intentional Conduct.

The disciplinary board's subsequent action did nothing to correct the committee's mistaken reliance on a mandatory presumption of intent. The board expressly adopted the hearing committee's summary judgment findings, including its finding of knowing and intentional conduct.[10] The board's only point of disagreement with the committee was with the committee's analysis of the legal consequences of finding an intentional misapplication of funds. In accepting the committee's findings on this point at face value, the board mistook them to mean that the committee found that Friedman actually knew that his trust payments were premature. Acting on this interpretation, the board understandably

---

**10.** I find it highly unlikely that the board would independently redetermine disputed factual issues without giving the parties advance notice or making its decision to do so clear in its opinion—particularly when the Bar Rules do not give the board authority to independently redetermine disputed facts in the context of an appeal from a hearing committee's recommendations. *See* Alaska Bar Rules 22(*l*)-(m), 25.

rejected the committee's recommendation for leniency as untenable.

D. *The Court's Reliance on Independent Fact-finding Compounds the Disciplinary Board's and Hearing Committee's Errors.*

Today's opinion chooses to overlook the significance of these procedural flaws; by so doing, it invokes the court's independent fact-finding powers to cure a denial of due process.[11] In giving short shrift to the fundamentally flawed process below, the court tacitly views Friedman's defense as too implausible to warrant serious consideration. Yet this is a profoundly troubling view. It ignores the hearing committee's unmistakable conclusion that Friedman did present a credible defense. Even though the hearing committee heard Friedman's defense in the procedural context of the sanctions hearing, where the issue of intentional conduct had been foreclosed by its earlier summary judgment ruling, the committee concluded that Friedman might not have known that the trust account checks were premature when he signed them. Having seen and heard the testimony, the committee was far better positioned to judge the issue of Friedman's intent than we are.

In my view, then, the committee's acceptance of Friedman's defense strongly counsels restraint in the exercise of our independent fact-finding powers. Sound precedent counsels restraint, too. This court is certainly empowered to "review[ ] the evidence adduced before the hearing committee independently while giving deference to the findings of the board."[12] Yet we can receive no appropriate guidance from the board without a meaningful and complete set of findings that reflect a correct understanding of applicable law:

> Though this court has the authority, if not the obligation, to independently review the entire record in disciplinary proceedings, findings of fact made by the Board are nonetheless entitled to great weight. The deference owed to such findings derives from the responsibility to conduct disciplinary proceedings which this court has delegated to the Bar Association. Where findings of fact entered by the Board are challenged on appeal to this court, we therefore hold that the respondent attorney bears the burden of proof in demonstrating that such findings are erroneous. As a general rule, moreover, we ordinarily will not disturb findings of fact made upon conflicting evidence, or where such findings reflect the relative credibility of witnesses.[13]

Here, because Friedman's defense turns largely on testimonial credibility and the hearing committee's factual findings incorporate a mistaken understanding of applicable law—one that indelibly colored its sanctions decision and tainted the disciplinary board's ultimate recommendation—I would find it inappropriate to invoke our original fact-finding power without first remanding to the bar for clarification.

By exercising original fact-finding power to reject Friedman's defense ˌwithout first clarifying precisely what the hearing committee found and how it reached its findings, the court today bypasses the very process that our rules establish as the starting point for independent review; it thus leaves no room at all for the guidance and deference that we have previously found crucial in cases turning on testimonial credibility. In my view, the supreme court must use its independent review power sparingly, as a supplement to, not as a substitute for, the carefully structured process of hearings and recommendations that is supposed to precede, illuminate, and enable independent review.

III. *CONCLUSION*

Because I would decline to exercise independent fact-finding power in these circumstances and would instead remand for proper findings, I dissent from the court's opinion.

---

11. Slip Op. at 626–627.

12. *In re Frost*, 863 P.2d 843, 844 (Alaska 1993).

13. *In re Simpson*, 645 P.2d 1223, 1226–27 (Alaska 1982) (citations omitted).